AAMCO AUTOMATIC
TRANSMISSIONS,
INC.

v.

Harry M. TAYLOE et al.

Gordon G. PARO et al.

v.

AAMCO AUTOMATIC
TRANSMISSIONS,
INC.

Civ. A. Nos. 73–391, 73–1615.

United States District Court,
E. D. Pennsylvania.

April 19, 1979.

Jeffrey D. Millaway, Law Office, George J. Hayward, Bridgeport, Pa., for Aamco Transmissions.

Oliver C. Biddle, Thomas P. Ruane, Aaron Jay Beyer, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for Harry M. Tayloe and Gordon G. Paro et al.

## OPINION AND ORDER

VanARTSDALEN, District Judge.

Civil Actions 73–391 and 73–1615 proceeded as a consolidated private antitrust class action. The class consisted of former franchisees of Aamco Automatic Transmissions, Inc. (Aamco) whose written franchise agreements required the franchisees to purchase certain equipment and inventory parts from Aamco. A motion to dismiss was denied (reported in 368 F.Supp. 1283). The class was certified (reported in 67 F.R.D. 440). Summary judgment on the issue of liability was entered in favor of the class on January 6, 1976 (reported in 407 F.Supp. 430).

Thereafter technically complex discovery as to damages was completed and the case was set for trial. Shortly before the trial date, Edwin P. Rome, Esquire, of Blank, Rome, Klaus & Comisky (now Blank, Rome, Comisky & McCauley), entered an appearance for defendant. After lengthy and intensive negotiations, a complex and unique formula for settlement was reached. The settlement was formally approved by the court after due notice and hearing. Substantial monetary payments will be made to class members based on the best available evidence as to the amount of each class member's purchases from Aamco at excessive noncompetitive prices during the class period. In addition, the settlement provides for the elimination and/or adjustment of extensive claims by Aamco against the individual class members for various unpaid charges for fees, services and purchases. No class member will be required to make any net payment to Aamco.

Plaintiffs' counsel presently seek an award for attorneys' fees, costs and expenses, including a substantial expert consultant's fee to one of the class representatives. The settlement agreement provides for a total settlement fund of a maximum of $1,200,000 for all claims, including costs of litigation. In accordance with what counsel understand to be the rule in *Prandini v. National Tea Co.*, 557 F.2d 1015 (3d Cir. 1977), no agreement was reached as to attorneys' fees. Paragraph 14 of the settlement agreement provides as to attorneys' fees as follows:

The Court shall determine what portion of the awarded attorney's fees shall be paid by Aamco over and above the Settlement Fund and what portion thereof, if any, shall be derived from the Settlement Fund.

At the hearing on the proposed settlement held December 8, 1978, counsel presented petitions for counsel fees and expenses together with accompanying affidavits and briefs. Class counsel stated its position that no more than 10% of the settlement fund of $1,200,000 should be utilized to pay attorneys' fees and that all additional fees awarded should be charged to Aamco. Counsel for defendant took the position that at least 10% of the settlement fund should be devoted to attorneys' fees, and that the total amount of fees awarded should not exceed 10% of the settlement fund plus any additional amount remaining in the fund after payment to all class members in accordance with the settlement agreement. Until defendant's claims against class members are finally resolved, and all class members' claims are thoroughly processed and verified, the final amount to be paid out of the settlement fund to class members cannot be accurately ascertained. Defendant calculates the possibility of several hundred thousand dollars excess, which will eventually be returned to defendant. Stated succinctly, defendant wants to limit the total which it will pay—including payments to class members, costs and expenses of experts and all attorneys' fees—to the $1,200,000 settlement fund. Plaintiffs' total claims for counsel fees, if awarded in full, would require a total payment substantially in excess of $1,200,000.00.

■ Unlike many class action settlements, where a defendant agrees to pay a single sum, and if the Court approves the settlement, all fees and costs are deducted from the settlement, this settlement allows the court to allocate all or a portion of the fees and costs from the settlement fund, and all or a portion thereof to be paid by Aamco in excess of the settlement fund. There were legitimate reasons for such provisions. By settling this case, defendant does not admit any liability, nor does defendant concede the validity of the order granting summary judgment on the issue of liability as a "per se" antitrust violation. If, however, there is any antitrust liability, as I have ruled there is, defendant is liable not only for treble damages, but also for "the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. Thus, it is appropriate for the parties to agree that the Court decide not only the amount of attorneys' fees to be awarded, but what portion, if any, should be paid by Aamco over and above the settlement fund.

The following applications have been made:

1. Ballard, Spahr, Andrews & Ingersoll
   Oliver C. Biddle, Esq., Class Counsel

   | | |
   |---|---:|
   | Attorneys' fees | $ 964,100.00 |
   | Reimbursement for Costs | 59,341.26 |

2. Quarles & Brady

   | | |
   |---|---:|
   | Attorneys' fees | 224,960.00 |
   | Reimbursement for Costs | 6,446.60 |

3. Gordon G. Paro, Class Representative

   | | |
   |---|---:|
   | Expert consulting and technical assistance to attorneys | 32,100.00 |

The applications are supported by affidavits that itemize the expenditures, nature of the work performed, date services were rendered, and time spent on each of the itemized services. There is no substantial challenge by defendant to the accuracy of the facts set forth in the affidavits.

At the conclusion of the hearing on the settlement, I ordered that $100,000 be paid out of the settlement fund on account of attorneys' fees. Despite the fact that this is an antitrust action, I believe it is reasonable that some minor portion of the total attorneys' fees be borne by the class members. Counsel for both parties contemplated that some portion, apparently approximately 10% of the settlement fund, could fairly be allocated to attorneys' fees. In the event the case was fully and successfully litigated by plaintiffs' counsel through the trial and appellate levels, obviously defendant would have to bear all of plaintiffs' counsel fees. Wholly aside from the amount of the class members' damages, however, there is genuine value to the class in not having to run the risk of error in the several critical rulings thus far made on the motions to dismiss, to certify a class and for summary judgment. The agreement, in providing that some portion of the attorneys' fees be charged directly against the class members' shares, was proper. A fair apportionment figure, to which no one has objected, is $100,000.00.

■ The reasonably necessary expenses of the litigation should likewise be paid out of the settlement fund. Ballard, Spahr, Andrews & Ingersoll (Ballard Spahr) has filed an uncontested claim for $59,341.36. By far the largest single item is a fee for accounting services by Arthur Andersen & Co. of $46,750.00. Proof of damages involved an extremely detailed analysis of all purchases by each individual class member of thousands of items from Aamco over a period from October 18, 1968 through October 18, 1972 (the class period). Evidence as to the exact purchases was difficult to obtain and verify. It required physically examining copies of invoices in defendant's possession and attempting to verify them against class members' often meager or nonexistent records. After extensive discovery disputes, defendant eventually located a computer print-out that required expert accounting analysis. There are approximately 200 class members. An item by item comparison of the individual class members' purchases with other available comparable products in a market that had constant price changes and fluctuations was essential. Without such calculations, adequate proof of damages would have been in grave jeopardy, and certainly would have made resolution of the dispute by settle-

ment extremely unlikely. The expenditure for the accounting services was entirely proper; it was necessary to the litigation. The charges of Arthur Andersen & Co. were the fair, reasonable and customary charges for such services. The balance of the Ballard Spahr expenses for which reimbursement is sought all appear to have been reasonably necessary and proper for processing the case; they likewise appear to be fair and reasonable in amount, and the usual and customary charges for such items. Therefore, the expenses of Ballard Spahr for disbursements of $59,341.36 will be approved.

Quarles & Brady is a law firm with its main office in Milwaukee, Wisconsin. Quarles & Brady, and/or its predecessor law firm, representing Gordon G. Paro, filed a class action complaint against Aamco in the Eastern District of Wisconsin on February 12, 1973. This action alleged substantially the same antitrust violations that Harry M. Tayloe had alleged in his class action counterclaim filed in Civil Action 73–391 in the Eastern District of Pennsylvania. The action pending in Wisconsin was transferred to the Eastern District of Pennsylvania, and thereafter consolidated with Civil Action 73–391 by order dated October 18, 1973. Quarles and Brady have continued to represent Gordon G. Paro personally in this action and have, as recognized by Ballard Spahr, cooperated with Ballard Spahr and provided valuable legal services on behalf of the class.

There does not appear to be any formal order designating Ballard Spahr or Oliver C. Biddle, Esquire, of that firm, as class counsel. The notice sent to the class members pursuant to Federal Rule of Civil Procedure 23(c)(2), approved by the trial judge, stated that Ballard Spahr had been designated as class counsel. All parties appear to agree that Ballard Spahr and/or Mr. Biddle was the sole class counsel.

The expenses of Quarles & Brady for which reimbursement is claimed include various travel expenses throughout the Midwest for the purpose of taking oral depositions, conducted for the class and with the full cooperation of Ballard Spahr. In many instances this avoided the necessity of a lawyer traveling from Philadelphia which would have imposed a greater expense. Quarles & Brady have also charged travel expenses for attending class action pretrial conferences called by the court. As will appear from examining the claims for reimbursement, many of the items were to pay witness fees to class members and others for subpoenaed depositions. All of these expenses appear to be proper, reasonable in amount, necessary and beneficial to the class.

The claim for reimbursement by Quarles & Brady is $6,446.00. Defense does not challenge this claim. I note the item "print-copy-telephone" is not itemized in any way. This item is $2,268.72 with the notation "2% of time charges." I will not approve such a method of estimating these costs, absent some verification as to the accuracy of such a calculation. Although a reasonable basis for estimating such expenses could be utilized, I have no way of knowing from the record if 2% of time charges is at all close to the reality of actual expenses. It appears more to be a rough estimate of certain normal "overhead expenses." These expenses will not be charged against the settlement fund, and it would be unfair to the class to allow such a charge. Reimbursement of $4,177.28 will be allowed.

Gordon G. Paro was the named class representative in Civil Action 73–1615. He is a former Aamco franchisee. He took an active personal interest in all phases of the case, as was properly his obligation as a class representative. In addition he personally performed extensive services in preparing the proofs of damages. Class counsel, on behalf of Mr. Paro has submitted an application for an expert's consulting fee in the sum of $32,100.00. Attached to the request is an undisputed, detailed affidavit setting forth the necessity for the work that Mr. Paro did, his unique qualifications and an itemization of the time spent, the dates and the nature of the work.

As to Mr. Paro's qualifications as an expert to make a comparative analysis of quality, price and availability of non-Aamco sources of supply, the affidavit avers that he has operated a specialty transmission shop for the last twelve years that has become the largest in Wisconsin; that he was an Aamco franchisee from 1966 to 1971; and that his intimate knowledge as to Aamco's parts numbering system, and packaged repair kits was essential for preparing a meaningful price comparison that could be utilized as trial evidence.

From the affidavits submitted, the briefs of counsel, the pleadings and the whole course of this litigation, it is apparent that without the assistance of Mr. Paro, the plaintiff would not have been able to establish the substantial damages claimed. In view of defendant vigorously contesting practically every motion and pretrial discovery request, and the extreme contentiousness of defendant, it seems obvious that Mr. Paro's work in this lawsuit brought ultimate benefit to the class far in excess of his claimed consultant's fee of $32,100.00.

■ Defendant does not contend Mr. Paro's services were useless or unnecessary; nor does defendant dispute the significant contribution to the class. Defendant's whole argument seems to be that because Mr. Paro is a class representative, he is not entitled to any fee for services, no matter how valuable or vital to the class, because he was "performing the duties that he voluntarily assumed as class representative."

Mr. Paro contends that he is claiming a fee only for work as an expert consultant. The affidavit he has filed detailing the time, date and work and services rendered, shows that there is indeed a careful segregation of duties that would normally devolve on one assuming the burden of a class representative—such as answering interrogatories and document requests (for which no compensation is claimed)—and those concerning expert proof of damage claims.

Surprisingly, no counsel has cited any case where a class representative expressly requested an allowance of a fee for special services rendered to the class. The uncontested affidavits establish the necessity for expert analysis and consultation, and that Mr. Paro was the best qualified person available to perform the required services. That being the situation, I know of no logical policy reason to preclude him from special compensation simply because he is a named class representative. His compensation is a necessary and proper cost of the litigation, and may, therefore, properly be taken from the settlement fund.

■ Aamco, as a party to this action, clearly has legal standing to resist the allocation of such a payment to Mr. Paro, and in any event it was proper to call the problem to the court's attention because the trial judge must ultimately decide the reasonableness of the claims and distributions. As a practical matter, however, the payment to Mr. Paro will not effect or increase the payment which Aamco must make, since the charge is being allocated out of the settlement fund as an expense, thus reducing the pro rata shares of the class members.

Mr. Paro is entitled to be compensated for the services he rendered to the class. However, I find the amount claimed to be more than can be reasonably substantiated and it will be somewhat reduced. The claim is on the basis of the days worked. The affidavit by claimant avers that "each day represents at least 8 full hours of time spent." He values his services at $75 per hour, which makes a total of $600 per day. There is nothing in the record against which to compare this hourly rate as to its "fair value," except by inference the comparison with the attorneys' fees claims, a not very satisfactory basis of comparison. Much of the work done, although requiring intimate and expert knowledge of the business practices of both Aamco and the franchisees, involved a somewhat mechanical, albeit detailed and time consuming, comparison of parts and price. Also, most professional consultants and experts employed for purposes of litigation operate consulting services as regular businesses or profession-

al enterprises, thereby incurring additional expenses such as office rent and maintenance, clerical assistance and other normal "overhead" expenses. There is no evidence that Mr. Paro had any comparable expenses in connection with the work done. There is no evidence that by spending the time on the services performed, he lost employment opportunities of greater financial benefit. On the meager record, it is difficult to establish a fair fee. I conclude that a reasonable rate would be $50 per hour for the 428 hours claimed, rather than $75 per hour. On this basis he will be awarded $21,400.00 from the settlement fund.

A detailed affidavit has been filed by Oliver C. Biddle, Esq., on behalf of the application of Ballard Spahr for counsel fees. A schedule has been attached setting forth the dates that specific services were performed, the time spent on each date— broken down into quarter-hour segments— and a fairly detailed description of the exact services performed on each date, together with the name of the attorney or legal assistant who performed such services. The time and work sheets thus submitted contain 36 typewritten pages. At the hearing, Mr. Biddle produced in court for examination by any interested party all supporting documents and data including time records, diaries and memoranda.

My understanding of defense counsel's position is that the total claim for counsel fees is excessive when compared to the overall class settlement. I do not understand defense counsel to seriously dispute the accuracy of the time records as to the time recorded and the detailed services performed; nor that the services were reasonably necessary and of benefit to the class; nor to the fairness of the hourly charges as an abstract fee-charging rate.

Class counsel seeks a fee award of $964,100 for the work to date. In the petition counsel seeks leave to reserve the right to file a supplemental petition for fees and expenses in (a) preparing the petition for fees and (b) administration of the settlement. In addition Quarles & Brady have filed a petition seeking $224,960.00. Before

considering defense counsel's position, the fee applications must be examined in accordance with the dictates of "Lindy I" and "Lindy II;" *Lindy Brothers Builders, Inc. v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976) (Lindy II), and 487 F.2d 161 (3d Cir. 1973) (Lindy I).

First should be determined the so-called "lodestar" figure, calculated upon the number of hours reasonably spent in prosecuting the claim, multiplied by the reasonable normal billing charge per hour for such professional services.

The records submitted with the application set forth a total of 6,168.65 hours of billable time. Of this approximately 720 hours, or 11½% of the total time, was spent by Mr. Biddle and another Ballard Spahr partner; approximately 3,675 hours, or 59½% of the total time, by associate attorneys of Ballard Spahr; and approximately 1,775 hours, or 29% of the total time, by "legal assistants." For each person who has performed services, the billing charge is itemized based both on "historical rates"; i. e., the rates that would have been charged at the time the services were rendered, and the 1978 billing rates. The total, based on historical rates is $360,723.00, and on 1978 billing rates, $428,501.00. If the total historical rates are used, the average hourly charge would be approximately $58.50 per hour for all services; and if 1978 rates are charged, the approximate average hourly rate for all services would be $69.50. For high caliber legal services in the Philadelphia area, either charge would be extremely reasonable. Also, from the records submitted, it can be calculated that the partners' "historical" rate averages approximately $105 per hour; the 1978 rates, $125 per hour. Associate attorneys' "historical" average hourly rate is approximately $65.75 per hour; the 1978 rates, $77.70 per hour. Legal assistants' "historical" average hourly rate is approximately $24.70 per hour; the 1978 rates, $30 per hour. These rates all appear to be reasonable and within the range of normal billing rates in the Philadelphia area.

There is nothing in the record to suggest that any of the work was unnecessary, unusable, duplicative, wasteful or not efficiently utilized. The large amount of legal assistants' time at less than half the hourly rate charged by lawyers attests to efficient utilization. The litigation was extensive and complex. Prior to the appearance of Mr. Rome, defense tactics clearly called for opposing every plaintiff motion to the hilt, and making discovery as technically difficult as possible. While I am neither criticizing nor commending the obvious defense strategy, a tremendous amount of paper work was generated which required plaintiffs' legal staff to consume enormous time and effort litigating procedural rather than substantive factual and legal issues. Docket entries alone exceed 600.

It is not without significance that plaintiffs frequently were required to seek court orders to compel and enforce discovery. As ably pointed out in plaintiffs' brief on the submission for counsel fees, when an issue, even a tangential one, was decided against the defendants' position, defendants would file, with a frequency that can be defined as regular if not invariable, a motion to amend, reconsider, interpret or vacate such ruling, occasionally followed by an attempt at appellate review, or the filing of a slightly different motion raising again the same issue.

The defense was not entirely unsuccessful. Plaintiff sought class certification of all present and former franchisees, but only former franchisees were certified as a class. The class was thereafter substantially reduced upon defendant's motion to exclude certain franchisees who had executed general releases prior to the commencement of these actions. Certain other franchisees whose agreements contained clauses substantially different from those of the certified class were also later excluded.

Defendant is not in a very good position to contend that the total hours spent of 6,168 including lawyers and legal assistants was excessive or nonproductive. In addition, I think it a reasonable assumption that many smaller law firms, faced with the many technical defenses raised to discovery and other pretrial procedures, would have used a much greater percentage of partner member services in place of associates and legal assistants whose rates are lower. I, therefore, find that the rates charged on an hourly basis were fully justified and that the services performed were reasonably necessary.

Although class counsel presents strong argument for utilizing the 1978 billing rates to determine the "lodestar" figure, I find the more appropriate method is to utilize the "historical" billing charges. The suggestion that waiting five or six years before receiving payment should be offset by utilizing current billing charges is logically tempting and supported by *City of New York v. Darling-Delaware*, 440 F.Supp. 1132, 1134 (S.D.N.Y.1977). It seems to me, nevertheless, that the delay in payment factor should be considered only in determining whether to add a bonus to the "lodestar." *Lindy II, supra* at 117, expressly notes that in determining whether to increase the "lodestar" one of the factors to be carefully evaluated is the delay in receipt of payment for the services rendered. *See In re Equity Funding Corp. of America Securities Litigation*, 438 F.Supp. 1303, 1331 (C.D.Cal.1977). I note, additionally, that delay in payment in major class action antitrust suits should be of relatively minor importance. Attorneys must recognize that such an undertaking involves protracted litigation and consequently they must anticipate a long wait for receipt of ultimate compensation, just as in most major "contingency" representations.

It is true that delay in obtaining payment should be a significant factor in cases where there has been deliberate delay by opposing parties. Although, as noted, defendants have stoutly and, no doubt abrasively, opposed plaintiff's counsel, thereby greatly prolonging this litigation, I am not prepared to rule, for purposes of establishing a fair fee, that there was any deliberate bad faith or unethical delay.

After determining the "lodestar," which I determine to be the "historical" rate per

hour multiplied by the hours, resulting in the sum of $360,723.00, separate inquiry should be made into the quality of the services and "contingency" factors, making specific findings of fact as to each.

The "contingency" factors to be considered have been enunciated in *Lindy II*, 540 F.2d 102, 117, as follows:

Under the rubric of "the contingent nature of success" the district court should appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit. The court may increase the amount established in the computation of the "lodestar" as a reasonable fee on the basis of a careful evaluation of the following factors:

1. Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case,—legally and factually; (b) the probability of defendant's liability,—whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages,—whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case. This category subsumes consideration of: (a) the number of hours of labor risked without guarantee of remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3. The delay in receipt of payment for services rendered.

If, having considered the foregoing or other relevant criteria, the district court desires to increase the "lodestar" award,

it should identify those factors supporting its conclusion, state the specific amount by which the basic fee should be increased due to the contingency of success, and give a brief statement of reasons therefor. We reiterate that any such increment in the "lodestar" award is to be considered and applied apart from the evaluation of the quality of services rendered in the particular proceedings.

The probability or likelihood of success on the issue of liability, as of the time that the class actions were filed was favorable but far from certain. Prior to the filing of the class actions, a consent decree had been entered in a proceeding filed by the Federal Trade Commission (F.T.C.) under Section 5 of the Federal Trade Commission Act. The consent decree, entered the same day the action was filed provided that Aamco would cease and desist certain practices with respect to its franchisees, which practices were the primary basis for the class action claims of "tie-in" sales in violation of the antitrust laws. As is customary, the consent decree was without any admission of liability as to past practices. Except for the F.T.C. proceeding, the outcome of the case as to liability was uncertain, as were the prospects of class certification and proof of damages.

As previously noted, defendant stoutly opposed class certification. It successfully precluded present franchisees from being designated as class members. It repeatedly sought, with some degree of success, to reduce the originally certified class size by redefining class membership requisites. Finally, it sought interlocutory appellate review.

Plaintiffs' basic antitrust claim depended upon the grant of a franchise as the "tying" element of an asserted per se antitrust tying agreement wherein franchisees were required to purchase certain parts and supplies from the franchisor. The actions in this consolidated case were filed prior to the decisions of the Court of Appeals for the Third Circuit in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), and *Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211 (3d Cir. 1976).

Plaintiffs' counsel knew, before filing the class actions, that defendant would probably assert substantial counterclaims and set-offs against most, if not all, the putative class members for breach of the franchise agreements, and for unpaid franchise fees and open accounts for parts and equipment purchases. Tayloe's class action was initially filed as a counterclaim to an action filed by Aamco in this district against Tayloe. Defendant cannot now deny the very serious threat its claims presented to an eventual substantial class action recovery, despite present attempts to minimize such prospects viewed from hindsight. Every procedural effort was made to assert such claims in the class action, albeit unsuccessfully. That such claims were more than a mere defense tactic is apparent from the disastrous effect on plaintiffs in *McAlpine v. Aamco Automatic Transmissions, Inc.*, 461 F.Supp. 1232 (E.D.Mich.1978). The *McAlpine* plaintiffs were a group of former Aamco franchisees certified as members of the class in this action, who "opted-out" pursuant to Federal Rules of Civil Procedure 23(c)(2)(A). The "opt-out" parties then brought their own action in the Eastern District of Michigan, and a final judgment was rendered in favor of Aamco on its counterclaims for the sum of $412,708.49, against the plaintiffs.

From the outset, the prospects of obtaining a substantial monetary recovery did not appear bright, even after the hurdles of class certification and liability were overcome. In essence, plaintiff's antitrust claim was that as a part of the Aamco franchise agreement, the franchisee had to agree to purchase certain initial equipment, and thereafter certain kits and inventory from Aamco. The statute of limitations would clearly bar many of the class members' initial purchase claims. Aamco always contended that (a) the agreements did not require the franchisees to buy from Aamco and (b) in fact, if such was a requirement, it was never enforced and there was no coercion.

Under plaintiffs' theory of liability, certain facts would have to be proved to establish damages. The dollar amount of sales of the tied products by Aamco to the class members during the class period would have to be proved. In addition, the price at which these same tied products could and would have been purchased on the open market by the class members would have to be proved. A plaintiff's lawyer would of necessity recognize that such proof would require very thorough and detailed discovery, and that the net result might fail to prove that Aamco's prices were higher than those of other available sources of supply, or that the actual difference was minimal.

Defense counsel has argued that, at least following class certification and the entry of summary judgment, the plaintiffs' attorneys could regard the "contingency factor as to the likelihood of success" as almost foregone certainty. I find nothing in *Lindy II* or any other case that suggests that any bonus or "add-on" factor to the "lodestar" figure should consider any lessening risks of failure as the case progresses or as it approaches settlement or other eventual resolution. On the contrary, *Lindy II* refers to "the probability or likelihood of success *viewed at the time of filing suit.*" (emphasis added).

Obviously the various rulings in plaintiffs' favor enhanced plaintiffs' prospects of ultimate success. Defendant, however, has never conceded the correctness of any of these rulings, and prior to final settlement, steadfastly preserved all possible appellate rights. Although the rulings on the motions to dismiss, to certify the class, and for summary judgment have been cited with apparent approval in various appellate and district court decisions (as cited in class counsel's brief), their validity has never been scrutinized under the microscope of appellate review. That these rulings have been cited in other cases suggests to me that the legal issues involved are in a state of development, change and uncertainty. The application of the antitrust laws to the rapidly expanding business of franchised trade name retail stores and service centers is not, as yet, clearly defined by case law, particularly as to whether certain practices constitute "per se" violations or are to be

judged under the "rule of reason." Under a "rule of reason" analysis, summary judgment would undoubtedly not be possible.

■ Factually, I find that the probability and likelihood of success at the time of the filing of the class actions although favorable was filled with extreme uncertainty, especially as to an eventual substantial monetary recovery.

*Lindy II* requires consideration of the complexity of the case, legally and factually. Plaintiffs' theory as to the antitrust violations was not complex, either legally or factually. As previously noted, however, proof of damages presented extremely difficult, time-consuming, complex problems. To establish substantial damages, an expert thoroughly familiar with Aamco business practices who could capably analyze and compare other available products, would have to complete extensive studies. Fortunately, Mr. Paro, a class representative, had the time, experience, stamina and resourcefulness to ferret out the necessary details.

I have previously discussed the probability of defendant's liability and the effect of the prior trade commission case. Although the theory of liability could hardly be said to be novel, it was, as I have pointed out, based on uncertain legal doctrines as to whether the express wording of the franchise agreements created a "per se" violation. I have further stated that the damage claims were extremely difficult to establish.

Coming to the next category in *Lindy II*, "the risks assumed in developing the case," we find under (a) a total of over 6,100 hours of otherwise billable hours expended by class counsel and his staff which based on "historical" rates amounted to $360,723.00. By any estimation this is a considerable risk of capital. Although the risk may have lessened as the work progressed, it must be pointed out, absent the settlement, there would be to this day no guarantee of an ultimate finding of liability, on appeal, in which event there would be no guarantee of any fee being available. Defendants have always maintained that the class action should not have been certified, that Aamco should have been permitted to assert individual counterclaims against each individual class member, that it committed no antitrust violation, that the granting of summary judgment was in error, and that in any event plaintiffs were in no way damaged.

Moreover, plaintiff's counsel has incurred extensive expenses in this litigation, totaling approximately $60,000.00. The major expense of hiring a nationally recognized accounting firm occurred after summary judgment was granted. This, however, did not substantially reduce the risk on appeal.

Plaintiffs' brief sets forth in some detail the expertise of counsel in major class action antitrust suits. My general observation and finding is that class counsel throughout this litigation provided the highest type of professional service to the class, in every respect. The litigation was conducted efficiently, and prompt attention was always given to various rulings of the court. Plaintiffs obtained summary judgment as to liability through the diligence of plaintiffs' counsel, whose well prepared motion evidenced very thorough discovery and able presentation of the issues, through incisive briefing and arguments of the legal issues in the best traditions of trial advocacy.

The delay in receipt of payment, referred to in *Lindy II* has been previously discussed. I adopt the proposition that "historical" billing rates rather than present billing rates should, whenever possible, be utilized in determining hourly rates to be calculated into the "lodestar" figure. From the outset, in determining "the contingency nature of success," counsel would normally consider the very real economic problem of awaiting payment for five or more years, even if the case were successfully concluded. This certainly justifies an increment over and above the usual hourly rate charged for services rendered over relatively short periods of time or on regular periodic billings.

Class counsel has requested an award of 2.25 times his "lodestar" calculation of $428,501.00. Counsel usually request, in fee applications, that the "lodestar" figure be

increased by some arithmetical multiple. *Lindy I* and *Lindy II* speak of increasing or decreasing the lodestar, and the factors to be considered. So far as I can ascertain the Court of Appeals has not provided guidance as to whether such increase or decrease is to be applied by a simple multiple or fraction, or merely by the calculation of a sum of money, based on the judge's best assessment. *Lindy II* advises that, after analyzing the various factors, the judge should "state the specific amount by which the basic fee should be increased due to the contingency of success." 540 F.2d at 117. This suggests to me that the basic fee should be increased, if at all, by a dollar amount, rather than by a multiple.

I am convinced there are other reasons that a stated dollar amount is preferable to a multiple or fraction. If, in calculating the "lodestar" figure, an erroneous calculation is made, by using a multiple the error is of necessity multiplied. Also, if a multiple is utilized, I have serious doubt that time spent by legal assistants and paralegals could be properly included. However, if the "lodestar" is not multiplied, then it is of little practical consequence whether legal assistants and paralegals are considered as part of the attorneys' fees or as an expense of the litigation.

Following the requirements of *Lindy II* I find that the "specific amount" by which the basic fee should be increased due to the "contingency of success" is $300,000.00. The factors have been heretofore detailed. This is approximately equal to the "lodestar" figure less the time and hours charged for legal assistants. In summary, although the probability of ultimate success as to liability was favorable, it was uncertain, and recovery of substantial damages was in any event very dubious, especially considering the potential counterclaims and the defense that Aamco charged its franchisees no more than open market prices. It was apparent that a final judgment or settlement in plaintiffs' favor could be obtained only after a long, hard struggle in a developing area of law.

■ Next, *Lindy II* requires consideration of the quality of the work, separate and independent from "contingent nature of success." As previously noted, the work of trial counsel was excellent. Briefs submitted by counsel for all parties were extremely helpful. A study of the briefs submitted on the present fee applications, including those of present defense counsel, amply illustrate the outstanding quality of the professional services rendered. The briefs that were frequently required were thorough, accurate and persuasive, without being so voluminous as to become self-defeating. Based on what I observed during the many conferences called in this case, Mr. Biddle approached the many difficult and often frustrating problems diplomatically, courteously and professionally with a skill far above that expected of lawyers other than those of the highest talents. He, and the members of his firm, have met the "heavy burden of proving entitlement to a bonus for exceptional services."

In determining whether to adjust the "lodestar" for exceptional quality of work, the results may be considered. *Lindy II,* 540 F.2d at 118. This suggests a comparison between actual results and maximum potential recovery. In this case plaintiff and defendant take divergent positions as to the maximum potential recovery and more importantly, as to the actual benefits obtained. The total cash amount that will be paid to the class members cannot be accurately and finally determined at this time. All claims have not been verified and certain claimed set-offs provided under the settlement agreement have not been ultimately determined as to particular class members.

The agreement of settlement provides a settlement fund of $1,200,000.00, from which the costs of litigation and such amount of the total attorneys' fees as the court deems appropriate are to be deducted. At the hearing, I directed that $100,000 of the fund be applied to the attorneys' fees. Deducting, in addition thereto, the costs of litigation, the total settlement fund for the class would be about $1,000,000.00. Presently, the total of the claims filed, less the

probable allowable set-offs, is about $735,-000.00. Consequently, it is quite possible that defendant will eventually be entitled to a refund from the settlement fund. Defense counsel suggests that total attorneys' fees should not exceed the net of this refund plus the $100,000 allocated; i. e., that defendant's total payments to the class, including counsel fees and costs should not exceed the $1,200,000 settlement. I think there is no doubt, however, that under the agreement of settlement, the court has the right to award counsel fees in excess of the balance of the settlement fund. Defendant does not seem to dispute the right of the court to so adjudicate.

Aamco asserted or attempted to assert claims in other courts against class members totaling about $3,675,000.00. Under the terms of the settlement agreement, all of these claims, except certain set-offs limited to about $283,000 will be cancelled. Thus, plaintiffs' counsel claim that their diligence procured for the class not only the cash settlement of approximately $735,-000.00, but also nearly $3,400,000 in terminated claims by Aamco. In addition, the settlement provides an expeditious and inexpensive method for the class plaintiffs to file their claims and have determined Aamco's set-offs. No class member will end up owing any money to Aamco. Thus, in a real sense, the settlement is worth far more than $735,000 to the class members.

The total amount of damages that plaintiffs could have received if completely successful is, as noted above, uncertain, and the subject of some disagreement among the parties. Assuming a treble damage antitrust claim, the maximum possible figure appears to be about $2,500,000.00, plus costs and counsel fees. However, much of that sum probably could not satisfactorily be proved by admissible evidence.

Taking into account the inherent risks in the case, particularly as so dramatically demonstrated by the results in *McAlpine v. Aamco Automatic Transmissions, Inc., supra,* I deem the overall settlement excellent from the plaintiffs' point of view, when compared to the maximum potential recovery, and the probable actual recovery in the event of a trial on the issue of damages. Many class members will receive substantial payments, some in excess of $10,000—a benefit they would probably never have realized but for the efforts of plaintiffs' counsel.

In arguing that the settlement, although fair, is very modest when compared with the maximum potential recovery, defense counsel contradicts the arguments that it made throughout the proceedings that plaintiffs in fact suffered no damages and could prove no damages. In order to minimize the quality of plaintiffs' counsel's work, defense should not be permitted to now disavow the validity of those defenses so strongly urged throughout the litigation.

The quality of the work, "separate and apart from the contingent nature of success" was outstanding, and calls for a bonus adjustment over and above the contingency adjustment in the sum of $100,000.00.

I find the "lodestar" billing rate to be $360,723.00, plus $300,000 for the contingency factors, and $100,000 for the quality of the work, making a total award of $760,-723.00, of which $100,000 shall be paid from the settlement fund and $660,723 shall be paid directly by Aamco to Ballard Spahr for attorneys' fees.

Quarles & Brady represented class representative Gordon G. Paro personally, and filed the class action complaint on his behalf in the Eastern District of Wisconsin. The action was transferred to this district and consolidated with the Tayloe class action counterclaim. Although neither Quarles & Brady nor any member of the firm was ever formally designated as class counsel, I recognized that law firm at all times as not only representing Mr. Paro individually, but also as representing him as one of the two class representatives. There is no dispute between counsel that while the responsibility as class counsel rested upon Mr. Biddle's shoulders, the two law firms would and did merge their efforts in the best interests of the class.

■ Defense has suggested that only the designated class counsel is entitled to an award of counsel fees, and that any other counsel must look to class counsel for a share of the fee. I find no support in any of the cases for such a proposition. If an attorney for a named class representative performs valuable services for the class, such attorney should be entitled to an attorney's fee. In any event, class counsel's submission for fees and costs could include the time, effort and services provided by an assisting or cooperating attorney not associated with class counsel's law firm. Mr. Biddle has acknowledged that Quarles & Brady performed valuable services for the class. Without their assistance, attorneys from class counsel's firm would have been required to expend additional time, particularly in extensive discovery conducted in the Midwest on the damages issues. Quarles & Brady are entitled to an award of reasonable counsel fees.

■ A careful record of time, in half-hour segments, was maintained by Quarles & Brady. It is noteworthy that no more than six hours was ever recorded for one day's work for one lawyer regardless of whether such lawyer actually worked in excess of six hours on the case on that day. The schedule itemizes dates, identifies the lawyers performing the services, and describes the work done. The schedule also distinguishes time spent on class action matters from time spent on Mr. Paro's individual claim. The hourly charges for the lawyers' time is $120.00. All lawyers of Quarles & Brady who worked on the case apparently are partners, and all bill at the same hourly rate. Recorded time for paralegals is set at $40 per hour.

The billable time is further subdivided between trial preparation time and settlement negotiation time. The total billable time thus is valued at $101,130 for attorneys' work and $6,138 for paralegals' work. In addition Quarles and Brady seek a $5,000 fee for preparing the fee petition. As to trial preparation time, the law firm seeks a bonus multiplier of 2.25 of the "lodestar" figure, and as to the settlement negotiations time, a bonus multiplier of 1.5. No bonus or add-on is sought for the paralegal hourly charges, nor for the fee application.

In an interesting attempt to justify the claimed bonus, Quarles and Brady have itemized by percentages the requested "add-ons" for each of the several factors that *Lindy I* and *Lindy II* direct the trial court to consider. For example, as detailed on page 11 of the application, a 10% add-on is requested for the category of "hours risked without guaranty of reimbursement," 5% add-on for "development of prior expertise." In all, Quarles & Brady would increase their "lodestar" amount by 125% as to their trial preparation time and 50% as to settlement negotiation time; thus, the claimed bonus of 2.25 and 1.5. While this method of attempting to quantify the quality and value of attorneys' services may be commendable for focusing attention on the requisite factors, I am not convinced that it accomplishes its purpose. In the final analysis, the setting of a fair attorney's fee by a trial judge has to be a "judgment call," in which there will inevitably be disparity in application among trial judges. No amount of mechanical and arithmetical formulae can completely eliminate the subjective determinations of the trial judges who must ultimately set the fees.

Quarles & Brady seek as the "lodestar" computation, a charge of $120 per hour for all lawyers' time and $40 per hour for paralegal charges. These rates apparently are the current rates of charge, not the "historical rates," which, as I previously noted in determining the Ballard Spahr fees is the more appropriate rate, especially where a bonus "add-on" is to be awarded. These charges average a great deal higher than the charges of Ballard Spahr. There is nothing to establish that "paralegals" in Milwaukee customarily are paid more in salary than in Philadelphia, or that Milwaukee attorneys customarily bill more for paralegals than do Philadelphia attorneys. I see no reason why the average billable hours should be at a higher rate for Quarles & Brady than Ballard Spahr. As previously noted, Ballard Spahr's historical billing time

for lawyers' services averages approximately $105 per hour and legal assistants $24.70. A fair and proper "lodestar" in this case for Quarles & Brady will be based on $105 for lawyers' time and $25 per hour for paralegals. Thus, the 842.75 hours of lawyers' time claimed in the fee application is worth $88,488.75, and the 153.45 hours claimed as paralegal time is worth $3,836.25.

I will add a modest bonus of $8,000 to the "lodestar" calculation. This is occasioned in part by the long delay in obtaining payment, bearing in mind my previous observation that I do not consider delay to be a particularly important factor. There is no doubt that the work that was performed, primarily as to damages in the discovery phases of the case proved of great value to the class. Nevertheless, the bonus must be kept relatively low, because in the final analysis the overall responsibility for properly prosecuting the action remained with Ballard Spahr. Only exceptional services above and beyond those normally billed by competent attorneys are to be rewarded. As noted in *Lindy II* at page 118:

> Rather, the increase or decrease reflects exceptional services only; it may be considered in the nature of a bonus or penalty. The heavy burden of proving entitlement to such an adjustment is on the moving party.

I find that Quarles & Brady have met the "heavy burden of proving entitlement" to a very modest bonus based on the "contingency of success" factor. At the time the action was filed, its outcome was, as previously noted, uncertain. Although I find the quality of Quarles & Brady's work to be excellent, the substantial rate per hour already used in calculating the "lodestar" is compensation enough for that excellence, so that no additional bonus need be awarded for quality factors.

Lest counsel consider the award to be insufficient, I refer to the recent opinion of Hon. A. Leon Higginbotham, Jr., Circuit Judge, sitting by designation, in *Meisel v. Kremens,* 80 F.R.D. 419 (E.D.Pa.1978). Various cases are favorably cited in that opinion where far more modest hourly rates were approved.

Request is also made for an additional fee of $5,000 to prepare the fee application. There is no hourly breakdown for this work. Time spent in preparing fee applications may be included as part of the attorneys' fees. Although an excellent brief with proper documentation was submitted with the application, the major portion of the work appears to have been the computation of hours and services from existing time records. Absent some further explanation, I find that a claim of $5,000 is excessive. An award, which I consider to be liberal, of $2,500 for preparing the petition will be made.

Defendant contends that the total fees sought are grossly disproportionate to the total class recovery. To some extent this depends upon the total monetary value of counsel's services to the class—a value upon which the parties have differing views. Defendant considers as having monetary value only the approximately $750,000 cash award that the class will ultimately receive. Plaintiffs maintain that the elimination of potential counterclaims or claims in separate actions of approximately $3,675,000.00, less set-offs that will be allowed in the amount of about $285,000 makes a total monetary value of $4,140,000.00. The total fees sought are $1,189,060 which plaintiffs assert is not excessive. The fees that are being awarded will be $859,711.75.

█ The total recovery to a class may be important in determining a fee where the fee is to be paid out of the settlement fund, but in this case it should be of relatively minor importance. The settlement agreement provides that the court shall set the fee and shall determine what, if any, portion thereof shall be charged against the settlement fund. In addition, this is an antitrust action. Even though Aamco admits no liability and no antitrust violation, by the present settlement agreement, the fact remains that summary judgment was earlier entered for plaintiffs. If that judgment was legally correct, then under the express language of the Sherman Act, plaintiffs would be entitled, in addition to

treble damages, to their costs and attorneys' fees. 15 U.S.C. § 15. In many cases where statutory attorneys' fees are awarded, the fees may be substantial and even exceed the monetary damages awarded. *See Merola v. Atlantic Richfield Co.,* 515 F.2d 165 (3d Cir. 1975).

Thus, total attorneys' fees of $859,711.75 will be awarded, of which $100,000 shall be paid from the settlement fund and $759,-711.75 shall be paid by Aamco. Costs and expenses shall be paid from the settlement fund of $63,518.64, plus $21,400 as an expert consultant's fee to Gordon G. Paro. Ballard Spahr have reserved the right to seek additional compensation for preparing the fee application and for additional services that may be required in completing the terms of the settlement.