**In re THC FINANCIAL CORP. LITIGATION.**

**No. 76–0448C.**

United States District Court,
D. Hawaii.

Feb. 7, 1980.

Josef D. Cooper, San Francisco, Cal., pro se and for Josef D. Cooper, a Professional Corp.

David B. Gold, San Francisco, Cal., pro se and for David B. Gold, a Professional Corp.

Michael J. LaVelle, Phoenix, Ariz., pro se and for Henry, Kimerer & LaVelle.

Kenneth S. Robbins, Honolulu, Hawaii, pro se and for Robbins, Chu & Reilly.

Lawrence I. Weisman, Honolulu, Hawaii, pro se.

David C. Schutter, Honolulu, Hawaii, pro se and for the Law Offices of David C. Schutter.

Thomas T. Watts, Honolulu, Hawaii, pro se and for Kemper & Watts.

Walter G. Chuck, Honolulu, Hawaii, pro se.

Jack C. Morse, Honolulu, Hawaii, pro se and for Jack C. Morse, a Law Corp.

David B. Gold, San Francisco, Cal., Walter G. Chuck and Jack C. Morse, Honolulu, Hawaii, for Locey plaintiffs.

Lawrence I. Weisman, Edward C. Kemper and Thomas T. Watts, Honolulu, Hawaii, for DeJarnett plaintiffs.

Josef D. Cooper, San Francisco, Cal., and Kenneth S. Robbins, Honolulu, Hawaii, for Chun plaintiffs.

Morio Omori and Warren H. Higa, Honolulu, Hawaii, for defendants Clyde Tanaka and Jack Chang.

Richard Harrington, San Francisco, Cal., for defendant Florence Crossley.

A. Alan Berger, San Jose, Cal., for defendant Glenn K. Mowry.

Charles K. C. Chang, Honolulu, Hawaii, for defendant Charles S. Voigt.

Albert I. Moon, Honolulu, Hawaii, Gary Lockwood, Chicago, Ill., and Charles A.

Adamek, Los Angeles, Cal., for defendant Continental Cas. Co.

Richard H. Hirai and Nathaniel Y. T. Lum, Honolulu, Hawaii, for defendant Dennis Kawakami.

Lincoln J. Ishida, Honolulu, Hawaii, for defendant George Kanahele.

Leland Spencer, Honolulu, Hawaii, for defendant Frederick H. Overstreet.

Henry Todd, San Francisco, Cal., for defendant Donald N. Call.

Paul J. Durbin, Honolulu, Hawaii, for defendant Gaspar Bora.

Gary Y. Shigemura, Honolulu, Hawaii, for defendant Allan Tamayose.

William F. Quinn and Anthony S. Chan, Honolulu, Hawaii, Martin Gendel and Richard S. Berger, Los Angeles, Cal., for defendants Bank of Hawaii and Hawaii Bancorporation.

Paul Maki, Honolulu, Hawaii, for defendant Randolph Crossley.

Louis B. Blissard, Honolulu, Hawaii, for defendant H. E. Howard.

Jason F. Oliver and Peter A. Lee, Honolulu, Hawaii, for defendants Edison C. Robinson, William C. Erickson, and the Estate of Jack D. Merriman.

Milton W. B. Choy, Honolulu, Hawaii, for defendant Joseph Carreira.

Thomas P. Dunn, Honolulu, Hawaii, for defendants Sanford Gadient and Dennis Alexander.

Gordon S. Churchill, San Diego, Cal., and George Schlavelli, Beverly Hills, Cal., for defendant Nicholas Wallner.

Raymond C. Sandler and Charles L. Birke, Los Angeles, Cal., for defendant James Deane.

E. Judge Elderkin and Richard D. Warren, San Francisco, Cal., for defendants Richard Bodman and Peter Redfield.

Theodore Kolb and Robert E. Graham, San Francisco, Cal., for defendants Homer O. Croasman, Edward D. Sultan, Jr., and Samuel A. Cooke.

Edward A. Jaffe, Richard R. Clifton and William A. Cardwell, Honolulu, Hawaii, for defendants Coopers & Lybrand.

Maciszewski & Smith, Honolulu, Hawaii, for defendant Jon Carlin.

Alexander C. Marrack, Honolulu, Hawaii, for defendant Jon Eicholtz.

Thomas W. Flynn, Honolulu, Hawaii, for defendants Ralph C. Hook, James H. Tabor, Lucius M. Neves, Gordon Damitio and R. Alexander Anderson.

Alan M. Goda, Honolulu, Hawaii, for defendants George Q. Cannon, Edmond H. Leavey and Edwin S. N. Wong.

Paul A. Lynch, Honolulu, Hawaii, Alfred I. Rothman and Robert A. Meyer, Los Angeles, Cal., for defendant Deloitte, Haskins & Sells.

Samuel O. Pruitt, Jr., Irwin F. Woodland and Fred F. Gregory, Los Angeles, Cal., and Benjamin M. Matsubara, Honolulu, Hawaii, for defendants John A. Calfas and Jack H. McDonald.

Dennis Potts, Honolulu, Hawaii, for defendant Stanley Damaso.

Michael Gless and Scott T. Pratt, Long Beach, Cal., and James W. Boyle, Honolulu, Hawaii, for defendant Carlsmith, Carlsmith, Wichman and Case.

G. Richard Doty, Los Angeles, Cal., and George L. T. Kerr, Honolulu, Hawaii, for defendant Peat, Marwick, Mitchell & Co.

Edward A. Nugent and John Michael McCormick, Los Angeles, Cal., for defendant The Home Ins. Co.

Kwan Hi Lim, Honolulu, Hawaii, for defendant Edward Bush.

Clarence F. T. Ching, Honolulu, Hawaii, for defendant Dennis Tsui.

Jerome F. Downs, San Francisco, Cal., for defendant Rex Kuwasaki.

Joseph Schneider, Honolulu, Hawaii, for defendant John L. Smart.

Don Jeffrey Gelber and James A. Wagner, Honolulu, Hawaii, for THC trustee.

Tamotsu Tanoka and David Hall, Honolulu, Hawaii, for THC financial trustee.

Sidney Roberts, San Francisco, Cal., and R. Charles Bocken, Honolulu, Hawaii, for Bank of America.

Henry, Kimerer & Lavelle, Phoenix, Ariz., guardian ad litem for plaintiff class.

Helen T. Tokushima, Honolulu, Hawaii, pro se.

James J. Peveler, San Rafael, Cal., pro se.

Robert E. Hardesty, Palos Verdes Estates, Cal., pro se.

Gordon Y. H. Wong, Honolulu, Hawaii, pro se.

Stanley W. Hong, Honolulu, Hawaii, pro se.

Eugene I. W. Lau, Honolulu, Hawaii, pro se.

William H. Pruyn, Honolulu, Hawaii, pro se.

Harry S. Dods, Honolulu, Hawaii, pro se.

Robert Abrisce, Honolulu, Hawaii, pro se.

Kenneth K. Sato, Kaneohe, Hawaii, pro se.

Bernard Amaral, Honolulu, Hawaii, pro se.

Daniel L. Colin, Kailua, Hawaii, pro se.

H. K. Bruss Keppeler, Honolulu, Hawaii, pro se.

Thomas S. Abel, Jr., Honolulu, Hawaii, pro se.

Fred C. Peterson, Honolulu, Hawaii, pro se.

## MEMORANDUM DECISION

CHRISTENSEN, Senior District Judge.

Now before the court for decision are applications for attorneys' fees and reimbursement of expenses out of a class settlement fund which was created by litigation occasioned by the collapse of THC Financial Corporation (THC Financial), one of the largest and most active industrial loan companies in the State of Hawaii, and its parent, The Hawaii Corporation (THC).

Three federal class actions and corresponding state class actions were brought against approximately 40 defendants represented ultimately by more than 32 separate law firms, including some of the more distinguished defense lawyers in the western United States. Separate suits were filed in the state court on behalf of a similar class against the State of Hawaii in reliance upon the Hawaii Tort Claims Act. Two additional federal actions were generated by the fall of THC Financial, one as a defendant class action by Continental Casualty Company on its director and officer liability insurance policy covering former directors and officers of THC and THC Financial, seeking rescission on the grounds, inter alia, that the policy was procured by fraud; the other a plaintiff class action on behalf of certain insureds under this policy for a judicial declaration that the policy was in full force and effect and that the insureds were entitled to coverage pursuant to its terms. The latter actions ("the Insurance cases") were of critical importance in the class actions against THC Financial ("the Financial cases") in that any policy proceeds would constitute the sole known assets of many of the former director and officer defendants. Various cross claims were asserted among defendants. The estates of both THC and THC Financial were placed in reorganization proceedings pursuant to Chapter X of the Bankruptcy Act, and the Trustees in time asserted claims against defendants named in the Financial class action cases.

Following some two years of pretrial proceedings, settlements of virtually all claims in this litigation, except for the actions against the State of Hawaii, have been confirmed. Resulting funds total $5,178,500, plus accruing interest. Because of the interrelationship between the claims of the class and the THC Financial Trustee, an agreement was reached in 1978 ("The Class Agreement"), assigning the Trustee's claims to the federal class. As consideration for this assignment, the settlement fund is subject to reduction of 10% up to $4 million and a small percentage of any amount of recovery over $4 million remaining after the deduction of court-awarded fees and costs. This portion will be paid to THC Financial's fidelity bond carrier. Also pursuant to that agreement, $700,000 of the recovery will be paid to the THC Financial Trustee for proration among creditors of THC Financial,

an estimated 95%–98% being members of the certified plaintiff class. Subject to the award of attorneys' fees and costs, the residue is to be distributed to members of the federal class.

Additionally, most members of the class will benefit by prorated shares from the liquidation of the THC Financial estate. Its Trustee in the beginning estimated that the face value of the depositors' investments which the estate would be unable to reimburse was over $9 million. At the time settlements were concluded, the Trustee's estimated "shortfall" had dropped approximately $6 million. His financial statement for October, 1979, predicted reimbursement of all but $3.4 million of the investments. Thus, the settlement fund (before addition of interest or subtraction of disbursements) likely will be slightly more than 152% of the shortfall. Honorable Martin Pence, Senior United States District Judge for the District of Hawaii, who presided over all bankruptcy proceedings, and J. Carl Osbourne, Trustee in Reorganization of THC Financial, are entitled to great credit for the remarkable results achieved from their investigation, marshaling and liquidation of corporate assets, which also significantly contributed to the ability of the parties to settle the litigation before me.

### FEE AND EXPENSE APPLICATIONS OF COUNSEL: RESPONSE OF GUARDIAN AD LITEM

David B. Gold, a Professional Corporation, Jack C. Morse, a Law Corporation, and Chuck & Pai, Hawaii lawyers associated with Mr. Gold, have requested total attorneys' fees of $730,000 and reimbursement of out-of-pocket expenses of $66,964. The associated Hawaii firm has also requested 4% of its awarded fees by reason of the Hawaii General Excise Tax.

The Law Office of Josef D. Cooper, P.C., and Cooper & Scarpulla (a predecessor firm), have requested total attorneys' fees of $484,853.25, plus such multiplier as the court may deem fair and reasonable under applicable law, together with reimbursement of out-of-pocket expenses of $87,977.

Robbins, Chu & Reilly, associated with Mr. Cooper, has requested attorneys' fees of $26,014, and the reimbursement of out-of-pocket expenses of $2,227, together with 4% of the amount awarded as fees by reason of the Hawaii General Excise Tax.

Kemper & Watts, P.C., has requested attorneys' fees of $148,596, increased by a multiplier of 2, and reimbursement of out-of-pocket expenses of $5,996.

The Law Office of Lawrence I. Weisman has requested attorneys' fees of $196,975, plus such multiplier as the court may deem fair and reasonable, and the reimbursement of out-of-pocket expenses of $6,541.

Thus, a total of approximately $1.744 million in attorneys' fees and expenses for class representation is requested, or about 34% of the recovery without reference to interest.

Regarding these fee and expense applications, the Guardian Ad Litem whom I appointed to represent the class in connection with these applications does not question the good faith and expenditure by the applicants of the hours of time claimed, the type of activity assertedly carried on, the actual expenditures of the out-of-pocket items claimed, nor the professional standing and ability of the applicants, but contends in substance:

1. Plaintiffs' attorneys should not be compensated for time spent in the bankruptcy proceeding even though purporting to represent the class and, in any event, such time should be substantially discounted by reason of duplication and unproductiveness.

2. The court should not consider compensation for duplications of work by class lawyers.

3. The court should exclude from compensable time, time spent by class lawyers in disputing among themselves procedures and strategies.

4. Various activities, positions, briefing, and negotiations were not reasonably undertaken on behalf of the class under the circumstances, or did not result in ultimate

class benefits, including efforts to insert in stipulations of uncontroverted facts and issues which the court had directed, partisan, argumentative or colored meanings which frustrated agreement.

5. The court should deny compensation for time claimed by certain attorneys in opposing the class settlement and the class agreement.

6. Certain attorneys failed to keep and maintain sufficient contemporary records to enable the court to determine whether or not many hours claimed were for the benefit of the class or otherwise compensable.

7. The hourly rates claimed are excessive.

8. The court should deny any multiplier if, indeed, it should not reduce lodestar figures, because the litigation was neither unusually complex nor particularly difficult for plaintiffs and substantial recovery was not really in doubt from the beginning.

9. Reimbursement of expenses should not include those relating to non-compensable time and, in any event, should exclude the extra cost of first-class travel, the travel expenses of more than one lawyer from the same firm; and the rate per page for photocopying of documents (which has resulted in combined claims of more than $50,000 for this one service) should be reduced.

10. The notice to the class indicating that attorneys' fees and costs would not exceed 25% of the recovery must be deemed controlling.

11. These and other considerations justify the reduction of the attorneys' fees to approximately $800,000 with a substantial reduction also in out-of-pocket expenses to be reimbursed from the class fund.

Rulings of the court have been reflected in 12 pretrial orders, formulated immediately following the respective hearings. These have not been published nor have there been any published opinions in the course of pretrial preparations to furnish a common frame of reference for the problem now before me. Hence, some organized details concerning the history of the litigation will be helpful. While the recitals that follow generally are in chronological order, there is some overlapping to permit follow-ups closely related to the subject matter of initially dated developments.

## HISTORY OF LITIGATION

On November 30, 1976, the assets of THC Financial, by reason of its failure to maintain required cash reserves in excess of 4% of its depositors' balances, were seized by the State of Hawaii through the Director of Regulatory Agencies, Wayne Minami, freezing approximately 14,000 depositors' accounts totaling some $41 million. Minami was appointed state receiver by order of the First Circuit Court of the State of Hawaii pursuant to statutes governing industrial loan companies. On December 8, 1976, an involuntary petition in bankruptcy was filed against THC Financial in the United States District Court for the District of Hawaii. On December 16 of the same year, THC Financial and its parent THC each filed a petition for relief under Chapter XI of the Bankruptcy Act. On the same day, J. Carl Osbourne was appointed Chapter XI receiver for the THC Financial estate. He took custody of THC Financial's assets from the state receiver. On January 31, 1977, while a proposed arrangement was under consideration by creditors, the Securities and Exchange Commission filed a motion to have the case proceed under Chapter X of the Bankruptcy Act. On March 18, 1977, that motion was granted and Mr. Osbourne was appointed Trustee in Reorganization. On September 18, 1978, the Trustee's plan of reorganization, which called for the orderly liquidation of THC Financial's assets, was approved by the bankruptcy court.

In the meantime, the three Financial cases had been filed in this court:

*Robert DeJarnett, et al. v. Randolph Crossley, et al.,* Civil No. 76–0448, filed by Lawrence Weisman as counsel on December 10, 1976, in association with the law firm of Kemper & Watts.

*Margaret Locey, et al. v. The Hawaii Corp., et al.,* Civil No. 77–0357, filed by

David B. Gold, a Professional Corporation, as counsel on September 8, 1977.

*Malani Chun, et al. v. The Hawaii Corporation, et al.*, Civil No. 77–0376, filed by Cooper & Scarpulla, as counsel on September 22, 1977.

The Financial cases asserted claims under the federal securities laws, state statutes and common law against, inter alia, certain of the former directors and officers of THC and THC Financial, the Bank of Hawaii, former independent public accountants and certain attorneys who had acted for THC and THC Financial.

At about or following the time class representatives filed their actions in federal court, they filed actions in the First Circuit Court of the State of Hawaii against the State of Hawaii asserting claims under state statutes and common law for money damages:

*Robert DeJarnett, et al. v. State of Hawaii*, Civil No. 50190, filed by Lawrence Weisman as counsel December, 1976, in association with the firm of Kemper & Watts.

*Malani Chun, et al. v. State of Hawaii*, Civil No. 52667, filed by Cooper & Scarpulla as counsel on September 28, 1977.

*Alice U. Ishiyama, et al. v. State of Hawaii*, Civil No. 54200, filed by David B. Gold, a Professional Corporation, as counsel on March 23, 1978.

The State of Hawaii filed third-party complaints asserting, among other things, claims for contribution and indemnity against certain former directors and officers of THC and THC Financial and their former auditors. Thereafter, the named plaintiffs in *DeJarnett, et al. v. State of Hawaii*, Civil No. 50190 and *Ishiyama, et al. v. State of Hawaii*, Civil No. 54200, amended their respective complaints to assert direct causes of action against third-party defendants. The State of Hawaii class actions were consolidated for pretrial purposes. Prior to the filing of civil actions numbers 52667 and 54200, the plaintiffs in *DeJarnett, et al. v. State of Hawaii*, Civil No. 50190, entered into a stipulation with the State of Hawaii that said action might proceed as a class action for the sole purpose of litigating class members' claims "limited to each member's deposits, investment certificates, less recoveries from all sources, including distributions in the bankruptcy proceedings and settlement or judgment in other litigation, plus interest" on behalf of "all owners of investment certificates issued by THC Financial Corp. or its subscribers for investment certificates ('depositors'), issued or to be issued by the THC Financial Corp., as of November 30, 1976."

Notice of the stipulation and its terms was given to all persons within the class definition on August 5, 1977. The plaintiffs in civil action numbers 52667 and 54200, on behalf of the class defined therein, which included purchasers of THC Financial registered subordinated debentures who were not members of the *DeJarnett* class, sought certification of their actions to proceed as a class action on behalf of the broader class and without limiting stipulation. One of such plaintiffs also filed a motion to set aside the conditional certification of the *DeJarnett* action and requested that the class certified in the State of Hawaii action be defined coextensively with the federal class. On May 15, 1979, the state court orally vacated the certification of the *DeJarnett* class, but took no further action.

Additional class actions ("the state Financial actions") were filed in the state court:

*Robert DeJarnett, et al. v. Randolph Crossley, et al.*, Civil No. 52058, filed by Thomas Watts as counsel on July 13, 1977.

*Alice Ishiyama, et al. v. Bank of Hawaii, et al.*, Civil No. 53732, filed by David B. Gold, a Professional Corporation, as counsel on February 6, 1978.

The state Financial actions asserted claims under federal and state statutes and common law against, among others, certain former directors and officers of THC Financial and their former auditors, virtually all of whom were defendants in the federal Financial cases. These actions were stayed by the state court in light of the pendency of the related federal proceedings before this court and have now been dismissed in view of the federal class action settlements.

In October, 1977, the named plaintiffs in the *Locey* action, Civil No. 77–0357, filed a creditors' claim against the THC estate in the bankruptcy court on behalf of the plaintiff class in the Financial cases. On December 7, 1977, the Trustees of the THC and THC Financial estates filed a joint complaint against the named plaintiffs in the Financial cases and a joint motion for preliminary injunction in the bankruptcy court seeking to dismiss or, in the alternative, to enjoin the prosecution of the Financial cases until conclusion of the bankruptcy proceedings (including resolutions of any actions which might later be brought by the Trustees). The Trustees argued that many of the claims advanced in the Financial cases belonged to the estates and that the prosecution of the Financial cases would diminish the potential recovery available to the estates and possibly require the estates to indemnify directors and officers for losses resulting from the Financial cases. The Trustees' complaints and motion were opposed by the named plaintiffs in the Financial cases, who argued that the class claims were separate and distinct from the claims which were later to be asserted by the Trustees. On March 31, 1978, the bankruptcy court denied the Trustees' motion and dismissed their complaint against the named plaintiffs in the Financial cases.

On December 30, 1977, the THC Trustee filed a motion for consolidation of the estate of THC with the estate of THC Financial, and on January 27, 1978, he moved to establish a discovery and briefing schedule and notified creditors of the hearing on his application. It was the position of the class attorneys in the Financial cases that had the THC Trustee prevailed on his consolidation motion, the creditors of that estate, who had extensive claims and limited assets, would have been able to share in the substantial assets of the THC Financial estate, thereby creating risk that funds available for distribution to THC Financial depositors who were class members in the Financial cases would be significantly diminished. The bankruptcy court found that the interests of the two estates and their creditors were adequately represented by the respective Trustees and essentially limited outside participation on the consolidation issue to the Securities and Exchange Commission. A circumscribed discovery and briefing schedule was established and shortly thereafter the consolidation issue was settled by agreement of the Trustees consistently with the interests of the class in the Financial cases.

On January 18, 1978, plaintiffs moved the bankruptcy court for access to the depositions, documents and internal memoranda of the THC Financial Trustee's investigative counsel on the ground that the Trustee's objective in undertaking his section 167 investigation was sufficiently akin to the class's interests in prosecuting the Financial cases as to permit the interchange of information. On February 22, 1978, the bankruptcy court entered an order permitting the Trustee, in his discretion, to release documents to the class plaintiffs and defendants. Following Osbourne's refusal to give class counsel access to most of the investigative material under a claim of privilege, plaintiffs filed companion motions on April 6, 1978, requesting an order allowing inspection, copying and use of sealed depositions or documents and an order modifying the court's February 22, 1978, order to permit Osbourne to grant plaintiffs exclusive access to investigative materials and to authorize his counsel to discuss related matters with class counsel. After oral argument on June 30, 1978, the bankruptcy court ordered the motion continued.

On October 11, 1977, the first consolidated pretrial conference in the Financial cases had been held before Judge Wong. He established a schedule for resolution of the threshold issues of whether plaintiffs' investments in THC Financial were securities and if so whether registration with the SEC was required. Plaintiffs' counsel were aware that Judge Wong had recused himself from the bankruptcy proceedings because of a potential conflict and orally requested further disclosure of the nature of that conflict. In discussions with the court, counsel for plaintiffs agreed that they would decide whether to formally seek the

judge's recusal by the next pretrial conference. During the next conference Judge Wong confirmed that his wife's brother was the President of Finance Factors, Ltd., a Hawaiian industrial loan company which was involved with the Bank of Hawaii in at least one loan transaction with THC. That and other business relationships between the judge and Finance Factors led plaintiffs to request orally that Judge Wong withdraw from the Financial cases. The court requested a formal recusal motion but on January 13, 1978, before its filing Judge Wong recused himself from presiding over the "securities" issue of the litigation. Deeming this limited recusal insufficient, plaintiffs filed their formal recusal motion on January 18, 1978, and at a hearing on January 27, 1978, Judge Wong circumspectly recused himself totally from this litigation. Shortly thereafter, I was requested to accept an assignment for the purposes of the litigation and related insurance litigation which was forthcoming.

On April 12, 1977, a plaintiff class action on behalf of all former directors and officers of THC or THC Financial ("the *Cannon* action"), had been filed by certain former directors and officers of THC and/or THC Financial in the United States District Court for the District of Hawaii, designated *Cannon, et al. v. Continental Casualty Company*, Civil No. 77–0120. This action sought a declaratory judgment that the Directors' and Officers' Liability Including Reimbursement Policy No. DOM1220231 was in full force and effect and that the plaintiff class in the *Cannon* action was entitled to the coverage provided thereby. On February 28, 1978, an action for rescission of the policy (the "Rescission action") was filed by the insurance carrier, Continental Casualty Co. ("Continental"), against a defendant class of all asserted beneficiaries of the policy, designated *Continental Casualty Company v. The Hawaii Corporation, et al.*, Civil No. 78–0065. That action alleged that the policy was fraudulently procured.

The first consolidated pretrial conference before me was held on March 17, 1978, upon the basis of which a pretrial order was entered which consolidated the Financial cases, established a schedule for completing service of the complaints, testing their sufficiency, and resolving the problems of class certification.

Shortly thereafter, the defendants filed various motions to dismiss or strike portions of each of the complaints in the Financial cases for failure to state a claim on which relief could be granted, alleging, inter alia, that the investments involved were not "securities" within the contemplation of the federal securities laws; that plaintiffs' claims under Section 12(1) and 12(2) of the Securities Act of 1933 were time barred; the moving defendants were not "sellers" of securities within the meaning of Section 12 of that Act; THC Financial was entitled to exception from registration with the Securities and Exchange Commission under Section 3(a)(5); plaintiffs failed to allege their claims relating to fraud with the requisite particularity; plaintiffs' pendant state claims should be dismissed; and that the complaint in Civil Action Number 77–0376 should be dismissed under Fed.R.Civ.P. 11. In addition, defendant Wayne Minami, former director of regulatory agencies of the State of Hawaii, moved for dismissal of all of the complaints as to him on the grounds that under the Eleventh Amendment to the United States Constitution he was immune from suit in a federal court for actions done in his official capacity. After briefing was completed and oral arguments were heard, all motions to dismiss or strike were denied except the motion of Mr. Minami which was granted.

On April 10, 1978, the named plaintiffs in the Financial cases moved the court for an order certifying the consolidated Financial cases as a class action. Defendants resisted this motion. After briefing and oral argument at a further pretrial conference on June 14–15, 1978, the court granted the motion for certification and approved the named plaintiffs' proposed form of class notice which was thereafter disseminated to all persons within the class definition, which was as follows:

All persons who currently own or hold THC Financial Corp. Investment Certificate(s), Subscription(s) to Investment Certificate(s), or Registered Subordinated Debenture(s).

The named plaintiffs in each of the Financial cases were designated as class representatives and Messrs. Watts, Gold and Cooper (one of counsel for plaintiffs in *DeJarnett, Locey* and *Chun,* respectively) were appointed as class counsel.

On July 15, 1978, merits discovery requests were filed. By August 1, 1978, plaintiffs were required to have completed first-wave discovery in accordance with the schedule established by pretrial order. That schedule, as modified to meet exigencies from time to time, covered all phases of pretrial activities and trial preparation including the filing and disposition of motions for summary judgment, the final pretrial conference and a trial date ultimately set for April, 1980. The Financial cases were consolidated for all purposes in view of intermeshed factual issues with the Insurance cases, subject to a severance of the latter for trial if determined to be desirable. A master file was established to contain the papers in all actions but segregated as between the Financial cases and the Insurance cases, and a master service list containing 70 or 80 names of lawyer and pro se appearances was assembled, service to be documented by general reference to it.

On August 29, 1978, pursuant to Fed.R. Civ.P. 23(b)(3), the *Cannon* action was certified to proceed as a class action on behalf of a plaintiff class defined as follows:

All persons who were officers or directors of The Hawaii Corporation or its subsidiaries, who were purportedly or assertedly insured under Directors and Officers' Liability Policy No. DOM1220231 issued by Continental Casualty Company and against whom a claim covered by the policy was made or is claimed to have been made within the policy.

The named plaintiffs were designated as class representatives.

On October 17, 1978, pursuant to Fed.R. Civ.P. 23(b)(1) and (2), the Rescission action was certified to proceed against a defendant class defined as follows:

Persons or entities who claim or may claim rights against the plaintiff Continental Casualty Company under its policy number DOM1220231, including The Hawaii Corporation and its subsidiaries, all persons who have been directors or officers of these companies, all holders of either equity or debt securities of these companies, and all creditors of these companies and other persons who are asserting, or may in the future assert, claims against the companies or one or more of said directors and officers and who, if successful, may thereafter assert a claim against the plaintiff under the policy.

Certain members of the certified plaintiff class in the Financial cases, all of whom were also defendant class members in the Rescission action, were subsequently designated a separate sub-class.

At the June 14–15, 1978, pretrial conference the court directed the parties in both the Financial and Insurance cases to confer in an effort to prepare a preliminary stipulation of background facts as a foundation for further discovery and as a step toward efficiently structuring the litigation, a statement of the remaining issues of fact that were reasonably subject to controversy, and a statement of the legal issues essential for determination by the court. Meetings were held among class and defense counsel during the summer of 1978 with a view to complying with the court's direction. Counsel in the Insurance cases did substantially comply with the court's directions. Financial class counsel as well as defense counsel spent excessive time in an endeavor to do so, but their efforts were not signally successful. Indeed, the process apparently became in part one of maneuvering for position or advantage and coloring proposed stipulation with argument and innuendo. In the process the insights of court and counsel were aided but excessive time was used by counsel in doing so, without achieving the usual benefits of comprehensive and objective stipulation of fact. Another product was the firming of my

conviction that unless the litigation were moved inexorably toward trial, prospects of meaningful agreements as to facts or law, much less overall settlement, might continue indefinitely as only remote possibilities.

Accordingly, merit discovery continued as scheduled and the November 14–16, 1978, pretrial conference dealt largely with discovery matters. Defendants had filed voluminous merit interrogatories which plaintiffs resisted on the grounds of prematurity, repetition, undue burden and oppression. Plaintiffs asserted that they were reluctant to spend the class money conducting detailed merit discovery while the possibility remained of obtaining access to the Trustee's investigative material either by motion to the bankruptcy court, legal process before this court, or by negotiations with the THC Financial Trustee.

On November 3, 1978, certain of the named class plaintiffs filed a motion pursuant to Fed.R.Evid. 803(8) to have the report of the THC Trustee under Section 167 of the Bankruptcy Act ("Trustee's Report") admitted into evidence and to establish an expedited briefing schedule for motions for summary judgment based on the evidence against certain defendants contained in that report. The court considered the latter prospect speculative but that admission of the report, with the excising of various obviously inadmissible materials either by agreement or by order of the court, might lead to an expeditious concentration upon the vital issues remaining in dispute. Accordingly, a special briefing and hearing schedule was established and the motion was taken under advisement to allow the defendants to conduct reasonable discovery concerning the trustworthiness of the report.

At the November 14–16, 1978, pretrial conference, certain class representatives announced that an agreement had been reached, subject to court approval, between the THC Financial Trustee, Home Insurance Company, THC Financial's fidelity bond carrier, and counsel for the *Chun* and *Locey* plaintiffs under which the *Chun* and *Locey* plaintiffs would obtain the THC Financial Trustee's investigative material as well as his claims and those of Home against officer and director defendants. Plaintiffs' formal motion for preliminary approval of the agreement came on for hearing in January, 1979, and preliminary approval was granted in Pretrial Order No. 7 filed January 26, 1979, over the objection of the *DeJarnett* plaintiffs. The court specially requested briefing on several issues relating to this class agreement prior to consideration of final approval, including whether assignment of the Trustee's claims resulted in waiver of the attorney-client or attorney work product privileges for materials which might otherwise be protected. The court thereafter approved this class agreement as fair and adequate, taking into consideration the savings in time and expense likely to result for the plaintiff class in avoidance of duplication of the Trustee's discovery and potential litigation between the named plaintiffs and the THC Financial Trustee over access to the investigative materials.

Pursuant to the class agreement, J. Carl Osbourne joined with designated trustees for the Financial class to bring an action (the "Class Trustees' Action") in this court on December 1, 1978, entitled *J. Carl Osbourne, et al. v. Thomas S. Abel, Jr., et al.*, Civil No. 78–0464. The complaint asserted claims under federal securities laws, state statutes and common law and sought damages and the imposition of a constructive trust in favor of the class Trustees as successor in interest to the THC Financial Trustee. This action was consolidated for pretrial purposes with the Financial and Insurance cases on March 24, 1979. On December 15, 1978, the THC Trustee filed an action ("the *Goss* case") in the United States District Court for the District of Hawaii, sitting as a court of bankruptcy in reorganization proceedings under Chapter X of the Bankruptcy Act entitled *"In the Matter of The Hawaii Corporation, Debtor; John T. Goss, Trustee v. John Randolph Crossley, et al.*, Bk. No. 76–0512(29), also designated Civil No. 79–0037". The *Goss* complaint asserted, inter alia, claims for money damages against former directors

and officers of THC and its former auditors resulting from alleged breaches of duty, negligence and other wrongful conduct. The *Goss* case in effect presented competing demands upon the Continental Insurance Company and further complicated the problem of settlement.

As permitted by the class agreement with the Trustee and Home, the class representatives, during the period December, 1978, through March, 1979, reviewed in excess of 100,000 separate documents from the THC Financial Trustee, including selected work papers of THC Financial's prior auditors, the investigative work papers of Touche Ross & Co., who had been employed by the Trustee, and voluminous corporate records. The class agreement had committed the THC Financial Trustee to document and index each factual assertion made in the Trustee's report. These indices cross-referencing said documents to the Trustee's report, however, were not delivered until late April-May, 1979. On February 22, 1979, defendants in the Financial cases moved to compel plaintiffs to produce documents received from the THC Financial Trustee as to which plaintiffs had asserted the THC Financial Trustee's attorney-client or work product privileges.

At the March 22–24, 1979, pretrial conference, this court ruled in substance that, assuming arguendo that a privilege would have otherwise existed and had been preserved, it had been waived with respect to documents received or reviewed by Dan Colin, a defendant in the Financial cases who had served as an employee of the THC Financial Trustee. On the basis of this decision, plaintiffs agreed to produce the final Touche Ross report and its work papers, together with a supplementary schedule of other documents outside the Colin ruling as to which privilege was still asserted.

From April 30, 1979, until June 18, 1979, when the court stayed discovery pending consideration of a proposed global settlement, the parties took depositions on virtually every available day in accordance with the court's schedule looking to a trial date

in April, 1980. Defendants deposed Trustee Osbourne, various members of his staff, and various Touche Ross personnel on matters both going to the merits and to the trustworthiness and admissibility of the Trustee's report. Plaintiffs also deposed personnel of certain of the accountant defendants and the Bank of Hawaii, reasonably avoiding deposition duplications for which the Trustee's material seemed adequate.

In March, 1979, the court in the Rescission action granted the motion of counsel for the defendant class for summary judgment, holding that Continental was not entitled to rescission. It was determined that even though there may have been factual issues requiring trial with respect to the alleged fraud in the inception, these had been waived as a basis for rescission by the failure of Continental to interpose a compulsory counterclaim in the *Cannon* suit among other things.

Shortly after entry of the summary judgment against the insurance company in the Rescission action, class plaintiffs and the THC Trustee (Goss) initiated efforts to bargain jointly with Continental in respect to liabilities covered by the insurance, with the understanding that any resulting settlement proceeds would be divided on the basis of 55% to the plaintiff class and 45% to the THC Trustee. In April, 1979, an agreement in principal among the class plaintiffs, the Trustee and Continental was reached. Upon the suggestion of the parties, the court, primarily to prevent further diminution of the insurance policy by defense costs, stayed all discovery relating to the former directors and officers by its "emergency order modifying pretrial orders numbers 6 and 8 in the Financial cases and related orders in the Insurance cases." The basic provisions of the tentative agreement between the Financial class representatives and Continental provided for payment of approximately $2.1 million to the class for all acts covered by the policy. The Financial class representatives, however, reserved the right to prosecute causes of action against certain of the directors and officers who had committed acts excluded from poli-

cy coverage. It developed that accrued defense costs of the former directors and officers to be deducted from the face amount of the policy were more than anticipated by Continental and a problem arose as to the waiver of bad faith claims against the insurer which had not been resolved by direct negotiations between it and the directors and officers. Accordingly, the tentative understanding was not finalized, Continental ceased direct negotiations with the Financial class representatives and began direct negotiations with the former directors and officers with a view to the provision of a fund through them which would facilitate settlement of both the Financial cases and the *Goss* suit.

In June, 1979, counsel for the class representatives in the Insurance cases announced to the court a settlement in principal between them and Continental and at a hearing in Salt Lake City, Utah, on June 22, 1979, the court considered whether that settlement was entitled to preliminary approval. This settlement, later finally approved as a part of the global settlement, was negotiated importantly through the efforts of Theodore A. Kolb, class counsel in the *Cannon* suit whose outstanding assistance as officer of the court in implementing pretrial orders, along with that of William F. Quinn, attorney for the Bank of Hawaii, should be acknowledged. Upon objections of counsel for the THC Trustee and the urging of counsel for the *Locey* plaintiffs, this court deferred consideration of preliminary approval until the time of the pretrial conference previously set for August 6, 1979, so that it could also consider the interrelated settlement involving the plaintiff class in the Financial cases which was scheduled to come on for hearing on a motion for preliminary approval set for August 6, 1979.

The latter settlement in principle had been negotiated for the class by counsel for the *Chun* plaintiffs and reported to the court on June 18, 1979, in a conference call initiated by counsel for the *Chun* plaintiffs in which counsel for the *Locey* plaintiffs participated without prior notice of the settlement. The understanding on behalf of

the class involved the Bank of Hawaii, Hawaii Bancorporation, Pete, Marwick, Mitchell & Co., Deloitte Haskins & Sells, Coopers & Lybrand, and former directors and officers of THC and THC Financial who were parties in the Financial cases. The court consented to stay further proceedings and establish a schedule for the submission of the *Chun* plaintiffs' motion for preliminary approval of the settlements.

On July 6, 1979, the *Chun* plaintiffs filed their motion for preliminary approval of the settlements, citing, in support, the numerous issues of major import on the question of liability, the fluctuating state of the law concerning those issues, the ever diminishing insurance funds available for settlement, and the decreasing shortfall in the bankruptcy proceedings with the possible effect upon maximum damages recoverable for the class through trial. The motion of *Chun* counsel for approval was supported by the THC Financial Trustee and the *DeJarnett* plaintiffs and opposed by defendant Florence May Crossley and the *Locey* plaintiffs. Counsel in the *Goss* case opposed any action that might weaken access of the THC Trustee to the insurance proceeds. The main thrust of the *Locey* plaintiffs' objections was that the settlement with the accountant defendants of $1.412 million was too low, the claims against the director and officer defendants should not be settled for $2.4 million until the plaintiffs reviewed personal financial information from at least the most culpable directors and officers and all of the settlement agreements failed to provide assurance that the class would ever receive anything approaching a represented amount of the proposed settlements because of the probability that distribution would be delayed by appeals or frustrated by conflicting claims. In addition, the *Locey* plaintiffs contended that the plaintiff class's total damage claim constituted at least $9 million on the class's principal investments and approximately $7 million for the loss of the use of the proceeds of their investment. On August 2, 1979, the *Chun* plaintiffs submitted for approval an additional settlement with defendant Carlsmith, Carlsmith, Wichman & Case.

Following briefing and oral argument the court gave preliminary approval to the settlement agreements in the form proposed, although expressing concern over the amount of the accountants' settlement, the possibility that appeal by the THC Trustee might delay distribution to the class and, if successful, might prevent distribution at all, particularly should summary judgment in the Rescission action be reversed, and the fact that the agreement provided broad cooperation clauses which had to be funded by the class.

A hearing on final approval of all proposed settlements was scheduled for October 3–5, 1979. Before this the THC Trustee reached agreement with Continental and the former directors and officers, thereby eliminating most of the concerns of the court concerning the proposed settlement. Final approval was considered upon notice to the class at the October hearing. With modifications occasioned by the settlement between the directors and officers and the THC Trustee and clarification of some points questioned by counsel for the *Locey* plaintiffs, the settlement was approved. An additional settlement with the defendant Florence May Crossley, who had been sued by the class Trustees, was also announced by *Chun* counsel. Provision was made for the filing and documentation of all claims for attorneys' fees and expenses against the class funds resulting from the settlement.

On October 23, 1979, this court approved the proposed form of notice which informed class members that a hearing would be held on December 11, 1979, at which the court would consider final approval of the Crossley settlement, applications for attorneys' fees and reimbursement of expenses and of their right and the procedure for objecting to either settlement or any fee petition. Such notice was duly given to members of the class on October 31, 1979.

On November 9, 1979, pursuant to the unopposed motion of two members of the plaintiff class, the court appointed Michael E. LaVelle, an experienced attorney who had been involved in attorney fee proceedings before the bankruptcy court as an investor representative, as Guardian Ad Litem for the class with respect solely to the application for attorneys' fees and expenses claimed against settlement funds. In that capacity, Mr. LaVelle filed objections to each petition for the award of attorneys' fees and expenses.

At the December hearing the court granted plaintiffs' motion to establish specific reserves for payment of defendants' attorneys' fees in the event that plaintiffs requested defendants' cooperation in the continued prosecution of the state court cases pursuant to the agreement of settlement; granted the motion of two persons who opted out of the class for reinstatement as class members; finally approved settlement with defendant Florence May Crossley; and heard evidence and arguments concerning the pending petitions for awards of attorneys' fees and cost reimbursements. The court also heard reports as to the status of the remaining claims and class escrow investments, discussed procedure for the payment of class's claims from settlement funds and made several rulings in the related Insurance cases, including the denial of the motion of Nicholas Wallner to opt out as a member of the classes in the Insurance cases. The submission by counsel of proposed findings of fact and conclusions of law was invited by the court, all of which have been considered in the formulation of this memorandum decision.

## FEDERAL LITIGATION SUBSTANTIALLY COMPLETED—RESIDUALS

Aside from the question of attorneys' fees for class representation claimed in the instant petitions, this litigation has been substantially concluded. There remain for determination claims against defendants Fred Hofknecht (deceased), John Inagaki, Gordon McCormick, Sr., Robert Tussell, Idabanco, Inc., Jack Chang, Milton Mau, Dennis Tsui, Grace Wee (never served with the complaint), Laron Bishop, Robert M. W. Lee, Lawrence Carlson, L. B. Franklin, Robert Smythe, Michael Pierce, and Timothy

Pierce (in *Osbourne, et al. v. Abel, et al.,* Civil No. 78–0464). At the December 11, 1979, pretrial conference plaintiffs informed the court that they were undertaking a review of the claims against those remaining defendants, most of whom were borrowers, who obtained unsecured, or undersecured, loans from THC Financial and that they would recommend the settlement or other disposition of these claims. The schedule for a method of distribution of the settlement proceeds to the class is to be fixed by the court. Any further petitions for awards of attorneys' fees or reimbursements of out-of-pocket expense which may be incurred in the resolution of the remaining claims or in the administration or distribution of the settlement funds must also be considered. Following the conclusion of the state court litigation, any remaining balance in the reserve established by the court pursuant to the class settlement agreement to the extent unexpended must be distributed to the class.

Up to the time of final settlement, both court and counsel have concentrated upon the ultimate objective of this class litigation—a fair, just and effective adjudication or settlement of the claims made on behalf of the class. In processes toward such end, a court must supervise proceedings and counsel with reasonable tautness, as I endeavored to do, but without becoming so involved with the day by day judgments of counsel as to procedures not at issue before the court or in their interrelationships as to threaten partisanship or undue meddling with professional judgments concerning tactics and strategies. Any errors in those judgments, vis-a-vis appropriate independence on the part of counsel, can only be searchingly reviewed in retrospect when the litigation is terminated and the question of compensation for past services in light of benefits to the class has been reached. The court, whatever its management responsibilities have been in the course of the litigation, cannot be in the position in fixing fees of having necessarily approved or underwritten the details of class counsels' representation and relationships among themselves or with opposing lawyers not fully

revealed or self-evident at the time. Of present and primary concern, of course, is the fixing of attorneys' fees and expense reimbursement for class representation from the more searching vantage point. In justice to counsel and with due consideration for the interests of the members of the class on whose behalf this litigation was initiated and prosecuted, as well as in view of the public policy for the encouragement of effective class representation generally, these issues also now merit careful consideration in the observance of established guidelines and the careful evaluation of entitlements on the facts and circumstances involved.

## GUIDELINES FOR AWARDS OF ATTORNEYS' FEES AND EXPENSES FOR CLASS REPRESENTATION

█ Familiar considerations entering into the fixing of reasonable attorneys' fees in general are relevant in the award of attorneys' fees for class representation: the time and labor properly employed by counsel in both the litigation and settlement of the cases; the quality and nature of the services rendered and the skill requisite to perform said services; the risk of litigation undertaken by counsel arising out of its contingent nature and the uncertainty of liability and damages; the magnitude, complexity and novelty of the various legal and factual issues involved; special problems posed by the quality, intensity and zeal of opposing counsel, the experience, quality and standing of plaintiffs' attorneys, and their usual level of compensation for similar services. But there are special considerations in the award of attorneys' fees in class litigation such as this.

█ Leading recent cases in this area are *Lindy Bros. Builders, Inc., of Phila. v. American Radiator and Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973) ("*Lindy I*"), and *Lindy Bros. Builders, Inc., of Phila. v. American Radiator and Standard Sanitary Corp.,* 540 F.2d 102 (3d Cir. 1976) ("*Lindy II*"). They of course recognize that since class action attorneys are provid-

ing legal services to a large group of people, most of whom have no direct contractual relationship with the attorneys, they are entitled to an award of fees out of any settlement funds generated by their efforts under the equitable fund doctrine, analogous to the theory of quantum meruit. The purpose of an award under the equitable fund doctrine is to compensate the attorney for the reasonable value of his services benefiting the unrepresented claimants.

One of the considerations for the fair award of attorneys' fees is to insure that counsel of high quality may continue to prosecute class actions. *Alpine Pharmacy, Inc. v. Chas. Pfizer and Co., Inc.*, 481 F.2d 1045 (2d Cir. 1973). The fee awarded should be substantial enough to operate as a proper incentive for the future initiation of class litigation serving the public interest. *Fortner Enterprises, Inc. v. U. S. Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); *Dolgow v. Anderson*, 43 F.R.D. 472, 494–95 (E.D.N.Y.1968). Yet both the reality and appearance of windfall fees should be avoided and to this end awards under the equitable fund doctrine should be made in moderation and with regard to the rights of those who are interested in the funds. *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1881); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ("*Grinnell I*"). In short, consistent with overriding concern for the interest of the class, a fair balance must be struck by the court between the need to foster a climate in which class litigation will be undertaken by competent counsel and a duty to the class to insure that the particular fee awarded is just compensation for actual services the benefit of which has been received by the class. *Liebman v. Petersen Coal and Oil Co.*, 63 F.R.D. 684 (N.D.Ill. 1974).

The responsibility of the court in the exercise of such a balance involves reasonable discretion, which only emphasizes its responsibility for fair and considered judgment in the first instance. *See Lindy II, supra,* 540 F.2d at 115–16; *Perkins v. Standard Oil Co. of Cal.,* 474 F.2d 549, 552, 555 (9th Cir.), *cert. denied,* 412 U.S. 940, 93 S.Ct. 2778, 37 L.Ed.2d 400 (1973); *Twentieth Century Fox Film Corp. v. Goldwyn,* 328 F.2d 190, 221–22 (9th Cir.), *cert. denied,* 379 U.S. 880, 85 S.Ct. 143, 13 L.Ed.2d 87 (1964); *Phillips v. Crown Central Petroleum Corp.,* 426 F.Supp. 1156, 1173–74 (D.Md.), *vacated* 556 F.2d 702 (4th Cir. 1977); *The Stanford Daily v. Zurcher,* 64 F.R.D. 680, 681 (N.D. Cal.1974), *aff'd* 550 F.2d 464 (9th Cir. 1977), 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

In the light of these principles, the time spent in preparation and support of applications for fee awards is not normally compensable from the fund, although under special circumstances some courts have awarded reduced compensation for this time. *City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1102 (2d Cir. 1977) ("*Grinnell II*"); *Lindy II,* 540 F.2d at 111; *Dorfman v. First Boston Corp.,* 70 F.R.D. 366 (E.D. Pa.1976); *but compare Barnett v. Pritzker,* 73 F.R.D. 430 (S.D.N.Y.1977).

An indispensable step in awarding fees under the *Lindy* and *Grinnell* standard is the determination of a "lodestar" or "reasonable compensation" for an attorney's efforts on behalf of the class. The lodestar is calculated by multiplying compensable hours by an attorney's hourly rate of compensation. In deciding what hours are compensable "the first inquiry of the court should be into the hours spent by the attorneys—how many hours were spent in what manner by which attorneys," *Lindy I, supra,* 487 F.2d at 167. *See also Lindy II, supra; Grinnell I,* 495 F.2d 448 (2d Cir. 1974), and *Baughman v. Wilson Freight Forwarding Co.,* 583 F.2d 1208 (3d Cir. 1978). A critical factor to consider is that the number of hours to enter into the multiplication is not necessarily those actually devoted to the case, but rather the number reasonably utilized in performing the services for which compensation is proper. *See Baughman, supra,* 583 F.2d at 1216.

■ Fees may be taxed against the class under the equitable fund theory only for services actually conferring benefit upon the class. *Grinnell II,* 560 F.2d 1093, 1102 (2d Cir. 1977), *supra.* As stated in *Lindy II, supra,* 540 F.2d at 112 "the propriety of a particular award for an attorney's services from a common fund depends on whether the specific services benefited the fund."

It would be unrealistic and unfair, however, to view the problem of "specific benefit" wholly by hindsight. Manifestly an overall benefit is indicated by the very recovery creating the fund, and a rough test may be the overall contribution made toward this indispensable foundation for any award. In my view, a hypertechnical or sophistical test should be avoided. Carried to the extreme, the requirement for "specific benefits", if unduly fragmented or viewed only retrospectively, could fritter away fair compensation for all pretrial preparations in a case settled on the eve of trial. Work effectually providing the climate and inducement for advantageous settlement should not be cavalierly rejected. Benefit should be assessed reasonably within the context and history of the proceedings at the time the work was done. Thus, the rule should not operate to compensate counsel solely for motions won and penalize them, per se, for motions lost, or to deny compensation for preparatory work on depositions that may be canceled because of intervening settlement. *See Locklin v. Day-Glo Color Corporation,* 429 F.2d 873, 879 (7th Cir. 1970); *In re Penn Central Securities Litigation,* 416 F.Supp. 907 (E.D. Pa.1976), *rev'd* 560 F.2d 1138 (3d Cir. 1977) ("Penn Central"). Otherwise fruitless efforts which successfully increase pressure for settlement may be compensable. *See Lindy II,* 540 F.2d at 112. Conversely where work done by class counsel does not benefit or may be even detrimental to the class's interests due to factors which were, or should have been, reasonably foreseeable by class counsel, compensation for the corresponding time and effort should be denied. *Penn Central,* 416 F.Supp. at 918.

■ In arriving at the lodestar figure the court must consider such factors as whether too much time was devoted to certain types of activities and the extent of unnecessary duplication of effort among several class action lawyers. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717 (5th Cir. 1974); *Miller v. Mackey International, Inc.,* 70 F.R.D. 533, 537–48 (S.D.Fla.1976); *Penn Central, supra,* 416 F.Supp. at 917. The court also must consider the extent to which any of the hours logged were wasteful or inefficient. *Prandini v. National Tea Co.,* 557 F.2d 1015 (3d Cir. 1977). The amount of time consumed by a given task is to be weighed in evaluating the benefit which the class received from the work, the court being called upon among other things to consider the actual time consumed with reference to the time required for such tasks as seen through the court's experience and from its vantage point. *In re Armored Car Antitrust Litigation,* 472 F.Supp. 1357 (N.D.Ga.1979). It must determine whether the hours expended in performing the task, and thus the cost to the class, were reasonable in light of the complexity of the difficulty and quality of the work performed. *Blank v. Talley Industries, Inc.,* 390 F.Supp. 1 (S.D.N.Y.1975). Relevant to these inquiries is the question of whether work within an office was properly apportioned between partners, associates and paralegals. *Barnett v. Pritzker,* 73 F.R.D. 430 (S.D.N.Y.1977), *supra.* Time spent by partners doing work which more properly could have been performed by an associate and/or paralegals may be reduced or disallowed entirely. *Lindy I, supra,* 487 F.2d at 169; *Farmer v. Arabian American Oil Co.,* 31 F.R.D. 191, 193 (S.D.N.Y.1962), *rev'd* 324 F.2d 359 (2d Cir. 1963), *rev'd* 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964).

■ The nature of the litigation in general and the specific work or task being performed must be considered. *Blank v. Talley Industries, Inc.,* 390 F.Supp. 1 (S.D.N.Y.1975), *supra.* Where multiple "lead counsel" are appointed by the court each firm is entitled to compensation for reasonable preparation, time and attendance at court hearings. *In re Armored Car Anti-*

trust Litigation, 472 F.Supp. 1357 (N.D.Ga. 1979), supra. It has also been recognized that all members of plaintiffs' committees are generally compensated for attending committee strategy meetings and reasonable review and checking of the work of others together with coordinating and consulting as to discovery being handled by others. Where efforts of more counsel than the court finds necessary or reasonable are directed to a specific task, the court should compensate those counsel who had most direct responsibility for the overall conduct of the litigation, or most fruitfully acted. See, e. g., In re Equity Funding Corp. of America Securities Litigation ("Equity Funding"), 438 F.Supp. 1303, 1329; Penn Central, supra, 416 F.Supp. 917, 921, 926. Nonetheless, contributions from lawyers not formally appointed class counsel but who have benefited the class are justly compensable. Aamco Automatic Transmission, Inc. v. Tayloe, 82 F.R.D. 405 (E.D.Pa.1979).

■ Paralegal time ordinarily is to be reimbursed as an expense where appropriate, not counted as lawyer's time for the purpose of determining attorney's fees allowable. Desimone v. Industrial Bio-Test Laboratories, Inc., 83 F.R.D. 615 (S.D.N.Y. 1979). See also Grinnell I, 495 F.2d 448 at 473.

■ After arriving at the number of hours to be recognized in the fee award, appropriate hourly rates must be determined. In this stage of the process, hours may be separated into general types of effort, since activities such as administrative tasks usually should be compensated at lower hourly rates than more demanding services. See Lindy I, 487 F.2d at 167. Yet it has been suggested that all compensable time for each attorney should be compensated at a uniform hourly rate. Equity Funding, supra, at 1330. The different hourly rates paid to senior and junior attorneys have been presumed to recognize the allocation of legal tasks from complex to routine in a properly run law firm. In re Armored Car Antitrust Litigation, supra, at 1385. Here, again, a rule of reason must apply.

■ Among the factors to be considered in fixing the hourly rate of compensation is the charge at which the same hours would have been billed if otherwise invested. Equity Funding, supra, 438 F.Supp. 1303 at 1329. It is relevant to examine the attorney's normal billing rate, which identifies the rate of return which the attorney might expect if the hours had been consumed doing work for regular clients rather than in the instant litigation. Grinnell II, supra, 560 F.2d 1093, 1099; City of New York v. Darling Delaware, 440 F.Supp. 1132, 1134 (S.D.N.Y.1977); Frankenstein v. McCrory Corp., 425 F.Supp. 762, 766 (S.D.N.Y.1977). Previous court decisions on the value of an attorney's time may be considered. Equity Funding, supra; Penn Central, supra.

There is division among the courts as to whether the hourly rate to be applied is the current rate or the rate that was charged during the earlier period when the services were actually rendered. It has been held that current normal hourly rates should be used in the lodestar calculation to minimize the detrimental effect of inflation upon the fee award. In re Ampicillin Antitrust Litigation, 81 F.R.D. 395 (D.D.C.1978); In re Master Key Antitrust Litigation, 76 F.R.D. 460 (D.Conn.1977), aff'd, 580 F.2d 1045 (2d Cir. 1978); City of New York v. Darling Delaware, 440 F.Supp. 1132 (S.D.N.Y.1977). Other courts have held expressly that the hourly rate to be applied is not the current rate but the rate in force when the work was done. Desimone v. Industrial Bio-Test Laboratories, Inc., 83 F.R.D. 615 (S.D.N.Y. 1979); Weiss v. Drew Nat'l Corp., 465 F.Supp. 548, 552 (S.D.N.Y.1979); Kane v. Martin Paint Stores, Inc., 439 F.Supp. 1054, 1055 (S.D.N.Y.1977), aff'd 578 F.2d 1368 (2d Cir. 1978).

■ The court should reimburse expenses which it finds were necessary, not extravagant and reasonably related to the interests of the class. In re Armored Car Antitrust Litigation, supra, at 1387. The "usual and customary" charges have been used as a measure of "fair and reasonable" expenses for which the class ought to be

responsible. *Aamco Automatic Transmissions, Inc. v. Tayloe*, 82 F.R.D. 405 (E.D.Pa. 1979). The court in *City of New York v. Darling Delaware, Inc.*, 440 F.Supp. 1132 (S.D.N.Y.1977), *supra*, reimbursed inhouse duplicating expenses at the usual customer rate of 10 cents per page over an objection that such rate was higher than commercial rates. Yet, in my view, the circumstances and considerations of burden of proof may dictate that rates applied in the past for other clients are not necessarily those which would be allowable against the class where outlays of greater magnitude are involved.

Once the lodestar figure has been calculated, this amount may be adjusted, either up or down, by the two factors of contingency and quality of work. *Lindy II, supra*, 540 F.2d at 118. A determination of "quality" does not mandate a detailed evaluation of an attorney's performance in each category of services, but rather recognition that exceptional services were rendered in one or more facets of the litigation. *Lindy II, supra*, 540 F.2d at 118. The court should be mindful, however, that the proper calculation of the lodestar by definition takes into consideration the time expended by the attorney. *Baughman, supra*, 583 F.2d at 1219. Any increase or decrease in fees to adjust for the quality of work is designed to recognize an unusual degree of skill or productiveness, be it unusually poor or unusually good. *Lindy II*, at 118.

A possible contingency factor or multiplier may be discounted in a case where class action counsel have the benefit of helpful investigations or adjudications from government action, where the liability is clear and the major problem is one of the amount of damages, or where the recovery of some fees or expenses has been otherwise assured notwithstanding the extent of the efforts of counsel. *See generally Grinnell II*, 560 F.2d 1093 (2d Cir. 1977), *supra*.

As already noted with respect to the evaluation of benefits in relation to compensable hours, so with respect to the contingency factor the court should fairly appraise the probability or likelihood of success in the litigation viewed as of the time of filings and as it progressed, as well as in light of ultimate success. Examination of complexities and difficulties legally and factually, the probability of defendants' liability, and the difficulty or ease of proving damages are important considerations. Both the quality and magnitude of the risks assumed in the light of resource commitments are relevant. Any ultimate contingency of the fee may be magnified by the length of time between the rendition of service and payment therefor. *See Fortner Enterprises, Inc. v. U. S. Steel Corp.*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965); *Dolgow v. Anderson*, 43 F.R.D. 472 (E.D.N.Y.1968).

Finally, with respect to governing legal standards, the burden of justifying a fee claim falls on the applicant. Uncertainties arising from inexplicitness in fairness to the class must be resolved against the lawyers who are seeking to share the fund. *Desimone v. Industrial Bio-Test Laboratories, Inc.*, 83 F.R.D. 615, 622 (S.D.N.Y.1979), *supra; Weiss v. Drew Nat'l Corp., supra*, 465 F.Supp. at 553. This does not mean that overly exacting reconstruction of the time spent by each lawyer on each particular type of task during the year is required, but any question of unreasonable vagueness in the record must be appraised critically. And it has been specifically held, with reference to a possible adjustment upward of the lodestar on the basis of quality, that there is a heavy burden of proving entitlement on the applicant. *Lindy II, supra*, 540 F.2d at 118.

## CONSIDERATIONS COMMON TO THE APPLICATION IN APPLYING GUIDELINES

In applying these guidelines to the respective applications, it will be useful to discuss considerations which are deemed generally to apply.

The expenditure of time and expenses for the purposes of the class litigation has not

been questioned aside from the question of their compensability from the class fund.

Generally speaking, I have no reason to question the "usual" hourly rates respectively claimed, except that they are not allowable merely because claimed and supported by some evidential showing. The application of "usual rates" must be weighed in the context of this type of litigation and the specific services performed, as well as in the light of claims for similar service and other circumstances shown by the record.

 Claims for paralegal services as part of attorneys' fees, even though they might have been made more appropriately as expense items, will not be disallowed for misallocation. They appear reasonable as the least costly professional service under the circumstances, and their inclusion as attorneys' fees does not critically alter or affect the application of the 25% notice ceiling on the allowance of attorneys' fees and expenses as I calculate them. I have had some question concerning the allowance of secretarial overtime as an expense item; yet the total amount is inconsequential and to that limited extent I cannot say that special circumstances did not justify treatment other than as overhead to be absorbed by the claimant.

██ The record indicates that at least the principal class attorneys charged the rate of 15 cents per page for photocopying, a rate usually billed to other clients but considerably in excess of commercial photocopying rates. This is explained on the grounds that "farming out" such work would be impractical and that it was necessary for counsel to retain control of materials to be copied in their own offices. The court agrees as to the reasons but questions whether charges of such magnitude in the aggregate for a single office can be justified simply on the basis of the usual charge to clients in general. Such charges to be allowed must be "out-of-pocket" expenses. The burden of proof as to such large charges has not been sustained to the extent the application of the 15 cent charge can be identified on the record. I agree

with the Guardian Ad Litem that a 10 cent rate should be sufficient considering all costs of maintaining equipment in offices with such large volumes. As to claims in smaller totals by associate counsel, there is an indication that smaller or commercial rates may have been charged. To the extent that they were not, the taking of further evidence is not justified and the court will assume that the smaller jobs justified the charges.

The evidence does not sharply differentiate in all instances between current hourly charges and those usual at the time particular services were performed. Generally speaking, however, it is likely that claims for fees have been based upon rates current for the period or year immediately preceding the filing of the applications. Recognizing differences among the cases as to the proper basis for allowances when differences in time are substantial, most of the fees claimed in this litigation were incurred over a relatively short time span as complex litigation goes, and I am impressed that delay and inflation factors should not be weighed so rigidly against applicants as to deny recognition that they otherwise would suffer from these factors as much or more than the class which at least will have some benefit from accruing interest on the settlement fund. This time consideration, accordingly, has not weighed substantially in reduction of rates otherwise supported by the record but the nature or mix of services in this particular case has been weighed in relationship to the customary bases for determining hourly charges.

On the threshold of his investigation, the Guardian Ad Litem's perception seemed to be that despite numerous parties and issues, there were few serious complexities involved in this litigation, substantial recovery was assured from the beginning, and the major tasks of counsel purporting to represent the class were to file their complaints, await the development of supporting facts through the Financial Trustee's investigation and report, and to negotiate the amounts of predestined settlements with opposing parties similarly impressed.

Perhaps such a retrospective view was an indirect tribute to class counsel themselves who out of a considerable jumble of cases, circumstances and procedures were instrumental in bringing about final results concerning which the Guardian has no complaint and in opposition to which no class member raised a voice at the time of approval by the court. After more complete investigating, including the taking of depositions of the principal claimants and participation in an evidentiary hearing, the litigation is characterized by the Guardian a little differently—"complex, multiparty litigation". We must agree that this was complex litigation, with complications not ordinarily encountered in many other complex cases.

Hindsight simplifies litigation almost as much as any actual simplicity in developing circumstances at the time would have done. At least viewed from the latter standpoint the problems of procedure, fact, law, liability, damages and realization were far from simple. The various multiparty lawsuits which emerged from the ashes of The Hawaii Corporation and its subsidiaries, seem deserving of the description "complex litigation". Throughout these proceedings, partly as a result of intertwined insurance problems, the class's interests have oscillated between conflict and harmony with those of the THC Trustee, the THC Financial Trustee and even the director and officer defendants. Whether at odds or in alignment, these convoluted interests have required class counsel to participate not only in the class litigation but also the related bankruptcy proceedings and the actions regarding disposition of the proceeds of the THC officers' and directors' liability insurance policy. The critical decisions made by class counsel required repeated reevaluation of objectives which were constantly reshaped by litigating exigencies in multiple forums.

The Guardian's contention that "[w]hile some of the legal issues presented in this litigation were difficult and novel, nonetheless the lawyers representing the class did not have the typical plaintiffs' problems with respect to discovery," too casually dismisses the extent and complexity of the legal problems, the developmental pressures of discovery itself and the apparent necessity for a time for class counsel to move forward on all fronts rather than to stand idly by while investigation with respect to overlapping issues and efforts to liquidate an uncertain portfolio were being independently conducted through the bankruptcy court.

The time devoted on behalf of the class in attendance and presentation in the bankruptcy court during the early stages of the litigation is characterized by the Guardian Ad Litem as gratuitous and futile. I do not agree. In that early period the development of facts and law, as well as theories and means for recovery, were in their exploratory stages. Counsel then could have been critically derelict if they had not closely followed related proceedings. At that time class counsel had not been designated. Organization and division of duties among them could not be expected to be as carefully arranged as later. Efforts to gain their bearings and to develop their sea legs, so to speak, should not be so critically discounted under the circumstances.

Later their failures to properly organize and divide responsibilities became evident, and I have taken these into account in determining allowable hours. But with respect to claimed duplication of efforts counterbalancing facts also must be recognized. Defendants' counsel were numerous and impressive in experience and reputation. In the early stages of my participation, I had no acquaintanceship and little basis for opinion as to the relative capabilities of class counsel in this particular situation. I was assured by all of them that they could work harmoniously together, as they had done in the past, and that there was no necessity for designating "lead counsel" as such, an assurance that was repeated at various times during the course of the litigation. Mr. Gold, Mr. Cooper and Mr. Watts appeared to constitute an effective combination for representation of the class. It was only when Mr. Watts evidenced ambivalence as between representa-

tion of the class in state litigation and that in the cases before me, with an apparent conflict of attitude if not interest, that his federal class representation was terminated. When conflict first developed between Mr. Gold and Mr. Cooper primarily with reference to settlement, I was surprised but not disheartened. As will be further noted when the individual contributions of class counsel are specifically addressed, both brought to the litigation respective strengths and capabilities which I recognized as complementing each other. I was not aware of the prior conflicts now revealed in connection with earlier processing of the case for trial. I was aware of their joint participation in some phases of discovery and at all pretrial conferences. I welcomed the latter participation both as a proper balance for opposing massive representation of the defendants and as an assurance of comprehensive and searching presentations which seemed essential as the case developed. Thus, class counsel are not to be faulted because of joint participations as such. Single representation in my opinion would have been inadequate and perhaps counterproductive. But failure to organize properly and divide responsibilities within this context, unjustifiable duplication of effort as a result of ego conflict or otherwise, and excessive belaboring of objections to settlements when already adequately presented, have been considered and given effect in the determination of compensable hours.

The possibility of charges being made against the federal class fund for work more properly allocated to cases against the State of Hawaii litigation has been of some concern. Only one instance of such an express charge has been found but it is obvious that in much of the initial work especially, the interrelationship of services has been inescapable, and travel expenses charged entirely to the federal class likely redounded to some degree to the benefit of the actions against the state. On the other hand, work on the state cases could have been of some benefit to the federal class. By study of the detailed claims I have endeavored to moderately reflect any such misapplications where apparent, but on the whole I have concluded that most of the claims are essentially free from demonstrable insufficiency or error on this ground.

Another circumstance which must be kept in mind is the indication in the notice to the class of a ceiling on total fees and expenses. At the time the court was weighing the justification of the proposed settlement as between the contentions of Mr. Gold and Mr. Cooper, I asked for an estimate of likely claims for total fees and expenses which had accrued to that date. It was suggested by class counsel, as I recall, that as much as $1.4 million may have accrued. I asked Mr. Gold what additional charges might be incurred for continued litigation in the event the settlement was disapproved and trial was had. He indicated that the additional cost could be about the amount already accrued. The continued cost of litigation on the one hand, and the erosion of the officers' and directors' liability policy by that continued litigation on the other, were among the considerations which weighed in the decision to approve the settlement.

Upon the preliminary approval of the settlement and in view of the amounts of estimated costs to that date, I insisted upon some reference to potential claims in the notice to the class of the hearing on final approval of the settlements. Counsel informed me that within the constraints of time it would be difficult if not impossible to quantify specific claims, but suggested that 25% of the recovery as a ceiling would adequately inform the class of outside possibilities so that they would be in a position to knowledgeably respond to the proposed settlement. This suggestion was accepted. The notice of the hearing included the following statement:

2(b) The Settlement Funds received will be deposited with and invested by an Escrow Agent(s) for the benefit of the certified plaintiff class. Following entry of final judgments dismissing the claims of the certified plaintiff class against each of the Settling Defendants, the Settlement Funds will be disbursed to the

members of the certified plaintiff class in a manner to be directed by the Federal Court. Prior to such distribution, the Court will consider any applications which may be filed for the award of attorneys' fees and reimbursement of costs and expenses for services performed for the benefit of the certified plaintiff class. The total fees and expenses awarded by the Court for such services will not exceed 25% of the amounts to be received under these settlements. In addition, the amount due The Home Insurance Company pursuant to its agreement with the certified plaintiff class, as approved by the Court (i. e., 10% of the first $4,000,000 of recovery and 5% of the amount in excess of $4,000,000 after the deduction of attorneys' fees and expenses) will be charged against the settlement proceeds. YOU DO NOT NEED TO DO ANYTHING IN ORDER TO SHARE IN THE DISTRIBUTION OF THE SETTLEMENT FUNDS.

As a matter of reasonable construction, as well as likely common understanding of counsel with the court, the 25% estimate covered both attorneys' fees and out-of-pocket expenses and was to be applied to the total of the "settlement funds" received by the escrow agent as a result of the settlements before deduction of the override but without the addition of accruing interest. Any expense payments approved out of the fund must be consistent with such a ceiling in fairness to the class which may have withheld objection to the settlement with that understanding.

 It is contended by the Guardian that there were frictions occurring between class counsel that went beyond simple disputes over the appropriate manner of proceeding in the best interests of the class. In massive litigation of this nature, where the class is opposed by numerous competent defense attorneys, it is entitled to be represented by more than one attorney. Pointed and even heated discussions or arguments concerning how the litigation should proceed may be expected among class counsel and, indeed, may ultimately be of great benefit to the class. In this case it is now revealed that occasionally disputes went beyond professional differences of opinion to obstruct timely and reasonable organization, adjustments and compromises. On one occasion multiple briefs were filed by class counsel consuming approximately 600 hours of time partly because of misunderstanding or inconsideration between lawyers. Duplicate answers to interrogatories were admittedly filed. Misunderstandings led to overly formalized relationships, including the hand delivery of letters to each other when informal contacts would have sufficed. Time wasted by such difficulties was not of benefit to the class and the court has considered this problem in reducing a number of compensable hours awarded to the counsel involved. The opposition by Mr. Watts of the approval of the class agreement negotiated by other class counsel occasioned wasted effort chargeable to Mr. Watts, especially in view of conflict involvements in connection with the state court litigation which he also was handling. The most substantial dispute was over the global settlement itself. After June 18, 1979, when discovery was stayed, more than 1000 hours were spent in connection with the presentation of, objection to, and the approval of, the settlement. The time spent by Mr. Gold's office in opposition has been particularly taken into consideration in reducing that firm's award. The Guardian Ad Litem argues that Mr. Cooper's time was also needlessly increased but whether this argument is directed to a reduction of Mr. Cooper's award or a corresponding increase in the deduction from the Gold award, I have not recognized it in any adjustment, especially since in view of the opposition by the Gold firm to the settlement, the form and in some respects substance of the documentation was improved to which I have attached counterbalancing weight in favor of Mr. Gold.

The Guardian argues that there is evidence that attorneys representing the defendants in this case and even co-counsel could not work comfortably with Mr. Gold, especially in settlement negotiations, and that the fee award should be reduced for

resulting wasted time and frustrated effectiveness. There was a suggestion that as long as Mr. Gold was jointly participating with Mr. Cooper in negotiations with the defendants, settlement could not have been reached. Counsel for the THC Financial Trustee has described certain nonsubstantive disputes that made simple matters unnecessarily arduous. Class counsel should not be held to a requirement that he has gotten along well with the parties on the opposite side of the lawsuit. Indeed, that could be the hallmark of ineffective class counsel. The controlling question should be whether or not any extra efforts expended by such differences of opinion were beneficial to the class. I find that in their negotiations with the defendants the Cooper and Gold offices proceeded in good faith in attempting to obtain as much money as each thought was possible from the defendants for their clients. It is my further view that even though the personalities and styles of negotiating by the respective attorneys may have varied and involved some disharmony, it is impossible to say whether these variant styles and personalities in and of themselves were or were not ultimately beneficial. Indeed, one of the considerations for appointing Messrs. Cooper and Gold as co-counsel for the class was because I felt their respective personalities and strengths could reasonably complement each other. I have given no weight to the criticism of opposing parties to negotiating pressures utilized by Mr. Gold, nor have I been led by reason of this rejection to any discounting of the effectiveness of Mr. Cooper's milder and perhaps more considerate approaches.

In addition to Mr. Gold's excessive time in opposing the class settlement, the Guardian particularly complains of his attempt to put the Trustee's Report into evidence and excessive time spent by all class counsel in drafting a statement of undisputed facts and factual and legal issues in compliance with the court's direction, attempts to resist the THC Trustee's motion for consolidation in the bankruptcy proceeding, and the extensive amount of time logged in preparation for, and travel to, hearings.

In my opinion, of the last mentioned complaints only the excessive amount of time spent drafting a statement of background facts and the remaining legal issues warrants reduction of the hours credited as beneficial to the class. Efforts to place the Trustee's Report in evidence innovatively provided entre into many of the evidential issues which could have been decisive at the trial. They also afforded pressure and movement toward settlement. It cannot be fairly said that these efforts were overextended or that they were not of substantial benefit to the class. The efforts of class counsel in the bankruptcy proceedings, particularly with reference to consolidation and recusal matters, were justified in view of uncertainties and potentials existing as of that time. As the situation was developing, counsel could have been criticized more for standing by without effort than for asserting the position of the class in those contexts.

The time spent in preparation for pretrial hearings no doubt importantly contributed to the expedition with which successive pretrial conferences were conducted and the ability of the court, with the cooperation of counsel, to conclude each hearing with a definitive pretrial order on the spot. When I contemplate the far more extensive expenditure of time that would have been involved in drafting, circularizing and arguing about the form of pretrial orders, each dealing with numerous problems, if they had been left to be crystallized after counsel had separated, and the complexity of the problems of each conference, I cannot be hospitable to any objection to time spent in preparation.

■ There is some merit to the contention that substantial amounts of work, including the preparation of pleadings and other documents by younger members in the Gold and Cooper offices, took longer than was reasonably necessary and that especially in Mr. Gold's office excessive hours were spent in administrative functions that to a greater extent should have been entrusted to paralegal or clerical assistants. I am not impressed by objection of the

Guardian to the participation of associates at hearings and in conference. Frequently during periods of pretrial hearings, investigation, discovery and negotiations were also conducted. Nor have I been able to fault the Guardian for his claim of compensation for both him and his associate at the hearing in which he participated. Objection to first-class travel costs of these first-class counsel is not meritorious. Such accommodations for additional work as well as relaxation by lawyers with the responsibilities and under the pressures they had were warranted and customary. It would be inappropriate to allow reimbursement out of the fund for taxes, whether income or excise, to be paid by reason of the receipt of fees allowed. Time records were adequately kept and maintained except by Mr. Weisman. Since I am allowing no compensation for time or expense devoted to the prosecution of the pending fee and expense applications, most of applying counsel have no recoverable charges between the date of their initial application and the December hearing thereon. Exceptions are the Gold and Cooper firms who have filed supplemental claims covering the period from the times of their initial applications to and including December 8 and 5, 1980, respectively. The awards made at this time include consideration of these supplemental applications.

## THE QUESTION OF A MULTIPLIER

Since we have taken into consideration the reduction of compensable hours to compensate for duplications of efforts, excessive or unjustified time claims and other activities unproductive from the standpoint of class benefit, none of the awards to counsel will have applied to it a negative multiplier. The high quality of the expectable services, in view of the assumed expertise of class counsel, has been recognized in the hourly rates applied. Yet, it has been considered with receptiveness whether the initial representation of the potential class by Messrs. Weisman and Watts would justify an increase in the lodestar figures. At the time their services were initiated, it undoubtedly was hoped that at least some recovery would result. Yet success beyond what might be realized by investors from bankruptcy proceedings was not assured. The contingency factor with regard to their efforts up to the time of the filing of the other two class actions was not insubstantial. Thereafter, there could have been the expectation of at least some recovery which would justify the further moderate expenditure of time and money. As time progressed, and the likelihood of a substantial recovery increased, the substantiality of the investment of time and money by counsel also increased. Nonetheless, I have concluded that despite difficult legal problems upon which ultimate recovery was dependent, there had developed by the time of the filing of the *Chun* and *Locey* complaints reasonable assurance of some substantial realization through settlement or trial. That possibility could have been substantially reduced by the rejection of a reasonable settlement when Mr. Gold and the defendants came to a parting of the ways as to settlement by reason of the possibility of the dissipation of the insurance proceeds in ever mounting defense costs, the complication of some of the factual issues on trial, the possibility and hazards of appeal and the lack of any assurance that the financial capabilities of defendants would continue over a protracted period of litigation. Mr. Cooper's efforts in bringing about the settlement finally approved by the court warrant special consideration on the basis of the quality of his work.

## INDIVIDUAL APPLICANTS

*The Gold Firm.* The Gold firm made substantial contributions to the progress of this litigation and the ultimate settlements reached. Mr. Gold was an effective advocate before the court at virtually every major hearing and provided significant contributions in most areas of the litigation. He was notable for vigor of presentation, expertise in the securities field, innovative, creative and occasionally imaginative concepts of substantive and procedural law, and a combativeness and assertiveness which evoked constant testing of opposition positions to a helpful degree.

It is not necessary for the court to pinpoint blame for disputes that arose between class counsel or difficulties in resolving matters with the THC Financial Trustee or members of the defense representation. It is enough for purposes of determining compensability for this court to find, as it does, that a substantial amount of the Gold firm's time was spent in matters that duplicated the efforts of other counsel needlessly or in unjustified opposition to the positions of his associate. The hours claimed by him have been reduced on the basis of the guidelines and general applications set out above, and particularly because of duplicating and unnecessary efforts in the preparation of the reply brief with respect to class certification, failure of proper organization of class counsel responsibilities shared with Messrs. Cooper and Watts, and undifferentiated and intransigent objection to the class settlement to the extent deemed unproductive and contrary to the interests of the class. The hours claimed by some of his associates also have been reduced. His claim for time devoted to his fee application has been disallowed. Claims for photocopying have been reduced by approximately one-third.

No multiplier has been applied up or down by reason of the substantial and expert contributions of the Gold firm as a whole which could well be expected from lawyers of such high caliber.

*The Cooper Firm.* Again this court incorporates the comments made above as applicable to all attorneys. Specifically it is to be observed that Mr. Cooper is a counsel of wide and productive practice in complex litigation, although not with the depth of experience in the securities field possessed by Mr. Gold. On the other hand, while Mr. Gold's expositions were often combative, innovative and to a degree experimental, Mr. Cooper's arguments and presentations were typically calm, measured and considerate. In earlier stages of the proceedings, these contrasting qualities complemented each other, but as the requirements of negotiation, compromise and balanced judgment became more demanding, the usefulness of Mr. Cooper's contributions was enhanced. He is somewhat unique among the applicants inasmuch as he, in a period of some few weeks, actually closed the settlements which resolved this litigation to the advantage of the class. It is undeniable, as noted, that Mr. Gold basically assisted in the movement toward settlement although impeding the resolution of particular problems by abrasive demands in some instances. The resulting opposition by other class counsel necessitated the spending of more time by Mr. Cooper in attempting to obtain approval of the settlement than otherwise would have been the case, but I find all of the latter's efforts in this connection to be compensable as conferring benefits upon the class. The Cooper application otherwise suffers some of the same problems of duplication and lack of interfirm organization already described, but the time spent in the preparation of his reply brief on the certification issue is not to be discounted since the work was well done pursuant to an assignment agreed upon by class counsel. The photocopying claim has been reduced by one-third.

The hourly rates sought by the Cooper firm with relatively minor adjustments are justified by the evidence. I am not impressed with the argument that Mr. Cooper's proof largely related to his hourly rate as designated lead counsel in substantial multiparty litigation. The present litigation was substantial multiparty litigation. His responsibilities analogous to those of lead counsel were not diluted by the sharing of those responsibilities with Mr. Gold in view of the latter's similar situation de facto, and increased responsibilities that arose from difference of opinion concerning procedures and settlement. Any recognition of related problems more appropriately can be, and has been, considered in the determination of hours expended for the benefit of the class, rather than by the reduction of hourly rates per se. I have considered that while Mr. Cooper's services in general were such as should be reasonably expected from experts in complex litigation in view of the hourly rate recognized for him, the assumed added responsibility, effectiveness and superior quality of his efforts which were

significantly responsible for the global settlement of the litigation warrant the application of a quality multiplier of 1.50 to $100,000 of his lodestar entitlement.

*The Law Office of Kemper & Watts.* Mr. Watts was certified class counsel for only a portion of the period involved in the litigation. He had associated with Mr. Weisman early in these proceedings and was largely responsible for amendments of the first complaint filed by Mr. Weisman. From the period January, 1977, through September, 1977, when the Gold and Cooper firms entered the litigation, Mr. Watts was engaged importantly in background discovery. Once the Cooper and Gold firms became involved, Mr. Watts' responsibilities were diluted and some of his efforts were duplicative of the work of other counsel; yet he continued to constructively participate in the litigation on behalf of the class until difficulties ensued between him and other counsel.

Not long after the Financial class was certified, communications between Mr. Watts and other plaintiff counsel deteriorated and it was not long before Mr. Watts was proceeding in relative independence of and without coordination with other class counsel. This lack of coordination resulted in further duplicative and misspent effort. Without placing the entire blame for this situation upon him, it is plain that as a result substantial time he claims is not compensable as for the benefit of the class. He engaged in disputes with other class counsel over the course the state proceedings should take with reference to the federal Financial litigation and filed formal opposition to the class agreement. Upon his removal as class counsel, Mr. Watts' ability to negotiate with the defendants was effectively terminated. He did not participate significantly in the negotiations of the final settlements.

Subject to these qualifications, I found Mr. Watts to be an earnest, sincere and capable young lawyer whose viewpoint was of assistance to the court. His historic hourly rate, unlike those of other counsel, was less than $75 per hour but I find that this figure should be accepted in the light of other circumstances. For reasons heretofore indicated with respect to the relative risks Mr. Watts assumed in his initial representation and until supporting facts and law began to emerge from his investigations and discovery, a multiplier of 1.40 will be applied to $25,000 of his lodestar figure.

*Lawrence Weisman.* While the other attorneys submitted detailed and complete time records, those of Mr. Weisman were undocumented estimates, sometimes covering several days rather than contemporaneous recording and drawing little meaningful distinctions between federal and state litigation. Moreover, the nature of large blocks of service to the extent their nature can be gleaned from his application is far from reassuring as to the propriety of charges even at the hourly rate which has been allowed. Indeed, the denial of a substantial fee by reason of a grossly excessive claim has not been lightly ruled out. However, in view of the substantial reduction in hours allowed, and because of circumstances hereinafter noted, I am persuaded that the award herein made is not inappropriate. Mr. Weisman was an experienced practitioner whose qualification for such litigation as this fell far short of that of Messrs. Cooper and Gold but whose responsibilities in the early stages of the litigation were primary and warrant recognition of a rate above other comparable counsel filling only supportive roles. Mr. Weisman filed the original complaint and shortly thereafter associated Mr. Watts who assumed primary litigation responsibility. This applicant spent many hours conferring with disgruntled depositors and conducting general investigations and research. How much of his efforts were reflected in ultimate benefit to the class is an imponderable. The class attorneys perceive no significant residuals from his work and the Guardian Ad Litem contends he is not entitled to any substantial award. It is undeniable, however, that he and Mr. Watts were in a sense the pioneers who roughly pointed up the broad outlines of the Financial litigation with only minimal assurance of substantial compensation for their initial efforts. As such, he is entitled to the application of a multiplier of 1.40 of $25,000 of his lodestar.

*Local Hawaiian Counsel.* Both the Gold and Cooper firms had reputable and able local Hawaiian counsel who the court finds had essentially the same monitoring and support duties, although one of them understood that he should prepare for actual participation in the trial should this become necessary. Special rating of local counsel because of understanding that he would act as trial counsel would be unjustified. Those particularly designated by the court as class counsel were fully competent for trial duty aside from advice concerning jury selection and other local considerations. A substantial portion of the time claimed by local counsel was actually devoted to the review of pleadings created and filed by others and yet within their rather moderate logging of time and considering the essential nature of their support functions and the input and assistance inevitably derived by lead counsel from their association, I find no reason to question their entitlement to substantially the time claimed at hourly rates which ordinarily were shown to be usual with reference to other responsibilities but which have been adjusted in view of an evaluation of the whole record. No multiplier would be appropriate.

## GUARDIAN AD LITEM'S PETITION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF OUT–OF–POCKET EXPENSES

*Michael J. LaVelle* of Henry, Kimerer & LaVelle, Guardian Ad Litem for the plaintiff class, has petitioned the court for an award of attorneys' fees in the amount of $19,835 and reimbursement for costs expended in the amount of $5,222. The amount requested reflects photocopying costs calculated at 10 cents per page. The Guardian Ad Litem has also petitioned the court for an award of attorneys' fees of $1,335 and reimbursement for costs expended in the sum of $622 to the law offices of David C. Schutter, the Guardian's local Hawaiian counsel. Certain class counsel have objected to the allowance of the requested attorneys' fees and disbursements on the ground that the Guardian's services to the class have been non-existent or inconse-

quential, subject to the court's evaluation. We have considered the Guardian's application, together with objections to it, and have determined that the application should be granted and the fees and expenses requested allowed.

The Guardian's services have been useful to the court in two ways: They have enabled the court better to evaluate the services of class counsel in view of controlling law to the direct benefit of the class in a sum not insubstantial, and they have afforded, in view of critical investigation, analyses and presentations beyond this, an assurance to the court that it has not overlooked any substantial considerations in considering the interests of the class itself vis-a-vis the effectively presented applications of class counsel.

## SUMMARY OF CLAIMS AND ALLOWANCES

The following table as to each petitioning attorney and those associated with them reflects the significant claims and rulings with respect to attorneys' fees and costs. The allowances are arrived at in consideration of the guidelines set out in this opinion, in harmony with the indicated general applications common to all claims, the special considerations I have specified with reference to specific attorneys and subjects or areas of concern, the applications, supporting documentation and memoranda of the petitioners, the entire record of the litigation, my observation of the attorneys and the proceedings in which they have been involved, the evidence received at the oral hearing on the applications and my experience, observations and judgment as lawyer and judge. Needless to say, it has been necessary in evaluating the applications to refer separately to lawyers within the respective offices but without intention to control ultimate distribution of fees within the respective offices.

It remains to thank counsel for the high quality of their services on behalf of the class and for the courteous and diligent assistance they have extended as officers of

the court to me. They will understand that this appreciation cannot be properly expressed by any award out of the settlement fund for efforts however diligent and able which in the judgment of the court have not been shown to have met the criterion of class benefit as discussed in this opinion. Yet they should know that my high regard for their standing and ability as lawyers, their many courtesies to the court, and their services to the class in this litigation continues.

| NAME | COMPENSABLE HOURS | HOURLY RATE ALLOWED | LODESTAR | MULTIPLIER | TOTAL FEES | REIMBURSABLE EXPENSES * | TOTAL AWARD |
|---|---|---|---|---|---|---|---|
| **PLAINTIFFS' COUNSEL** | | | | | | | |
| **GOLD OFFICE** | | | | | | | |
| David B. Gold** | 1350 | $150 | $202,500 | | $202,500 | $59,873 | $262,373 |
| Paul F. Bennett | 1400 | 85 | 119,000 | | 119,000 | | 119,000 |
| George Donaldson | 250 | 75 | 18,750 | | 18,750 | | 18,750 |
| David L. Braverman | 1600 | 60 | 96,000 | | 96,000 | | 96,000 |
| Robert Schaberg | 125 | 70 | 8,750 | | 8,750 | | 8,750 |
| John Allured | .2 | 60 | 12 | | 12 | | 12 |
| John Craig | 20 | 60 | 1,200 | | 1,200 | | 1,200 |
| Janet Ambrosek | 240 | 50 | 12,000 | | 12,000 | | 12,000 |
| Prescott Kendell | 65 | 50 | 3,250 | | 3,250 | | 3,250 |
| Raymond Sherman | 15 | 50 | 750 | | 750 | | 750 |
| Paralegals | 129 | 25 | 3,225 | | 3,225 | | 3,225 |
| **THE MORSE FIRM:** | | | | | | | |
| Jack C. Morse | 124 | 80 | 9,920 | | 9,920 | Included | 9,920 |
| Gordon Nelson | 240 | 55 | 13,200 | | 13,200 | in Gold | 13,200 |
| **CHUCK & PAI:** | | | | | | Included | |
| Walter G. Chuck | 54 | 90 | 4,860 | | 4,860 | in Gold | 4,860 |
| **COOPER OFFICE** | | | | 1.5 of | | | |
| Josef D. Cooper*** | 1550 | 145 | 224,750 | $100,000 | 274,750 | 76,729 | 351,479 |
| Tracy R. Kirkham | 1400 | 90 | 126,000 | | 126,000 | | 126,000 |
| James M. Garlock | 700 | 80 | 56,000 | | 56,000 | | 56,000 |
| Kirk McKinney | 55 | 80 | 4,400 | | 4,400 | | 4,400 |
| Hazel Weiser | 14 | 80 | 1,120 | | 1,120 | | 1,120 |
| Raymond G. Gong | 29 | 65 | 1,885 | | 1,885 | | 1,885 |
| Karen T. Friedman | 55 | 65 | 3,575 | | 3,575 | | 3,575 |
| Paralegals | 346 | 25 | 8,650 | | 8,650 | | 8,650 |
| **ROBBINS, CHU & REILLY:** | | | | | | | |
| Kenneth S. Robbins | 137 | 90 | 12,330 | | 12,330 | 2,227 | 14,557 |
| Harold Chu | 22 | 90 | 1,980 | | 1,980 | | 1,980 |
| Steven K. Hisaka | 60 | 80 | 4,800 | | 4,800 | | 4,800 |
| Gerhard Frolich | 10 | 80 | 800 | | 800 | | 800 |
| **KEMPER & WATTS** | | | | 1.4 of | | | |
| Thomas T. Watts | 800 | 75 | 60,000 | $25,000 | 70,000 | 5,996 | 75,996 |
| Edward C. Kemper | 53 | 80 | 4,240 | | 4,240 | | 4,240 |
| **LAWRENCE I. WEISMAN** | | | | 1.4 of | | | |
| Lawrence I. Weisman | 400 | 100 | 40,000 | $25,000 | 50,000 | 6,541 | 56,541 |

GUARDIAN AD LITEM

HENRY,KIMERER & LAVELLE

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Michael J. LaVelle | 77 | 85 | 6,545 | | 6,545 | 5,222 | 11,767 |
| Michael P. Stark | 219 | 60 | 13,140 | | 13,140 | | 13,140 |
| Pamela J. Franks | 3 | 50 | 150 | | 150 | | 150 |
| SCHUTTER OFFICE: | | | | | | | |
| David C. Schutter | 3 | 85 | 255 | | 255 | 622 | 877 |
| Reinhard Mohr | 18 | 60 | 1,080 | | 1,080 | | 1,080 |

Total Fees
& Expenses
Allowed:
$1,292,327

\* Expenses may have been paid in connection with the work of other associated attorneys but except as otherwise indicated they have been allocated to the heads of the respective offices.

\*\* Included as to Mr. Gold is a supplemental claim to December 8, 1979.

\*\*\* Included as to Mr. Cooper is a supplemental claim to December 5, 1979.

## CONCLUSIONS AND IMPLEMENTATION

Attorneys' fees and out-of-pocket expenses shall be allowed in accordance with the foregoing table. The Escrow Agent will be directed to disburse said awards from the settlement fund.

This memorandum decision contains my findings of fact and conclusions of law in keeping with Fed.R.Civ.P. 52(a). Any motions or suggestions for modification or amendment should be lodged with me within ten days from the date of this decision. Further briefing or argument is deemed unnecessary. Within the same period Mr. Cooper is requested to submit to the court a proposed form of final judgment in harmony with the views herein expressed, which submission by him shall not be deemed a waiver of any objections he may have to my findings and conclusions. Submissions will be acted upon without oral argument immediately following the expiration of the period stated. The judgment should provide for its finality in accordance with Fed.R.Civ.P. 54(b), upon an express determination that there is no just reason for delay. A reasonable stay following entry of judgment should be provided to afford opportunity for appeal.

Mr. Cooper is hereby designated as attorney for the class for the purpose of preparing and submitting recommendations for an order covering further procedures and implementing action to effect expeditious distribution of the residue of the settlement fund among members of the class and to otherwise terminate this litigation.